UNION LABOR LIFE INSURANCE CO. *v.* PIRENO

No. 81–389.   Argued April 27, 1982—Decided June 28, 1982*

---

*Together with No. 81–390, *New York State Chiropractic Assn.* v. *Pireno,* also on certiorari to the same court.

120

BRENNAN, J., delivered the opinion of the Court, in which WHITE, MARSHALL, BLACKMUN, POWELL, and STEVENS, JJ., joined. REHNQUIST, J., filed a dissenting opinion, in which BURGER, C. J., and O'CONNOR, J., joined, *post,* p. 134.

*T. Richard Kennedy* argued the cause for petitioners in both cases. With him on the briefs for petitioner in No. 81–389 were *Edward Thompson* and *Philip R. Kastellec. Robert P. Borsody* filed a brief for petitioner in No. 81–390.

*Susan M. Jenkins* argued the cause for respondent in both cases. With her on the brief was *Ralph C. Wiegandt.*

*Barry Grossman* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Lee, Assistant Attorney General Baxter, Deputy Solicitor General Shapiro, Jerrold J. Ganzfried,* and *Nancy C. Garrison.*†

---

†Briefs of *amici curiae* urging reversal were filed by *Richard A. Whiting* for the American Insurance Association et al.; by *Sidney S. Rosdeitcher* and *Richard D. Friedman* for the Health Insurance Association of America et al.; and by *David Crump* for the Legal Foundation of America.

Briefs of *amici curiae* urging affirmance were filed for the State of Arizona et al. by *Robert K. Corbin,* Attorney General of Arizona, and *Kenneth R. Reed,* Special Assistant Attorney General, *Steve Clark,* Attorney General of Arkansas, and *David L. Williams,* Deputy Attorney General, *J. D. MacFarlane,* Attorney General of Colorado, and *Thomas P. McMahon, Carl R. Ajello,* Attorney General of Connecticut, and *Robert M. Langer* and *John R. Lacey,* Assistant Attorneys General, *Richard S. Gebelein,* Attorney General of Delaware, and *Vincent M. Amberly,* Deputy Attorney General, *Tany S. Hong,* Attorney General of Hawaii, and *Sonia Faust,* Deputy Attorney General, *Tyrone C. Fahner,* Attorney General of Illinois, and *Thomas M. Genovese,* Assistant Attorney General, *Thomas J. Miller,* Attorney General of Iowa, and *John R. Perkins,* Assistant Attorney General, *William J. Guste, Jr.,* Attorney General of Louisiana, and *John R. Flowers, Jr.,* Assistant Attorney General, *Stephen H. Sachs,* Attorney General of Maryland, and *Charles O. Monk II,* Assistant Attorney General, *Frank J. Kelley,* Attorney General of Michigan, and *Edwin M. Bladen,* Assistant Attorney General, *Bill Allain,* Attorney General of Mississippi, and *Robert E. Sanders,* Special Assistant Attorney General, *John Ashcroft,* Attorney General of Missouri, and *William L. Newcomb, Jr.,* and *Robert E. Dolan, Jr.,* Assistant Attorneys General, *Michael T. Greely,* Attorney General of Montana, and *Jerome J. Cate,* Assistant Attorney General, *Paul L. Douglas,* Attorney General of Nebraska, and *Dale A. Comer,* Assistant Attorney General, *Jeff Bingaman,* Attorney General of New Mexico, and *James J. Wechsler* and *Richard H. Levin,* Assistant Attorneys General, *Rufus L. Edmisten,* Attorney General of North Carolina, *H. A. Cole, Jr.,* Special Deputy Attorney General, and *John R. Corne,* Associate Attorney General, *William J. Brown,* Attorney General of Ohio, and *Eugene F. McShane, Dennis J. Roberts II,* Attorney General of Rhode Island, and *Patrick J. Quinlan,* Assistant Attorney General, *Mark White,* Attorney General of Texas, and *James V. Sylvester,* Assistant Attorney General, *David L. Wilkinson,* Attorney

JUSTICE BRENNAN delivered the opinion of the Court.

In these cases we consider an alleged conspiracy to eliminate price competition among chiropractors, by means of a "peer review committee" that advised an insurance company whether particular chiropractors' treatments and fees were "necessary" and "reasonable." The question presented is whether the alleged conspiracy is exempt from federal antitrust laws as part of the "business of insurance" within the meaning of the McCarran-Ferguson Act.[1]

## I

Petitioners are the New York State Chiropractic Association (NYSCA), a professional association of chiropractors, and the Union Labor Life Insurance Co. (ULL), a Maryland insurer doing business in New York. As required by New York law, ULL's health insurance policies cover certain policyholder claims for chiropractic treatments. But certain ULL policies limit the company's liability to "the *reasonable* charges" for "*necessary* medical care and services."

General of Utah, *John J. Easton, Jr.,* Attorney General of Vermont, and *Glenn A. Jarrett,* Assistant Attorney General, and *Bronson C. La Follette,* Attorney General of Wisconsin, and *Michael L. Zaleski,* Assistant Attorney General; for the Association of American Physicians & Surgeons, Inc., by *Kent Masterson Brown;* and for Automotive Service Councils, Inc., by *Donald A. Randall* and *Jonathan T. Howe.*

*David J. Brummond* filed a brief for the National Association of Insurance Commissioners as *amicus curiae.*

[1] 59 Stat. 33, as amended, 15 U. S. C. §§ 1011–1015. The Act provides in relevant part:

"(a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

"(b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, . . . unless such Act specifically relates to the business of insurance . . . ." § 2, 15 U. S. C. §§ 1012(a), (b).

"(b) Nothing contained in this Act shall render the . . . Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation." § 3, 15 U. S. C. § 1013(b).

App. 19a, 22a (emphasis added). Accordingly, when presented with a policyholder claim for reimbursement for chiropractic treatments, ULL must determine whether the treatments were necessary and whether the charges for them were reasonable. In making some of these determinations, ULL has arranged with NYSCA to use the advice of NYSCA's Peer Review Committee.

The Committee was established by NYSCA in 1971, primarily to aid insurers in evaluating claims for chiropractic treatments.[2] It is composed of 10 practicing New York chiropractors, who serve on a voluntary basis. At the request of an insurer, the Committee will examine a chiropractor's treatments and charges in a particular case, and will render an opinion on the necessity for the treatments and the reasonableness of the charges made for them. The opinion will be based upon such considerations as the treating chiropractor's experience and specialty degrees; the location of his office; the number of visits and time spent with the patient; the patient's age, occupation, general physical condition, and history of previous treatment; and X-ray findings.

Respondent is a chiropractor licensed and practicing in the State of New York. On a number of occasions his treatments of ULL policyholders, and his charges for those treatments, have been referred by ULL to the Committee, which has sometimes concluded that his treatments were unnecessary or his charges unreasonable. Petitioners assert that respondent has treated his patients "in a manner calculated to maximize the number of treatments for a particular condition, and that his fees for these treatments are unusually high." 650 F. 2d 387, 389 (CA2 1981). Respondent, for his part, contends that the members of the Committee "practice 'antiquated' techniques that they seek to impose on their more innovative competitors." Ibid.

---

[2] The Committee's advice is also available to patients, governmental agencies, and chiropractors themselves, but insurers are the principal users. 650 F. 2d 387, 388 (CA2 1981).

This dispute resulted in the present suit, brought by respondent in the United States District Court for the Southern District of New York. Respondent alleged that the peer review practices of petitioners violated § 1 of the Sherman Act.[3] In particular, he claimed that petitioners and others had used the Committee as the vehicle for a conspiracy to fix the prices that chiropractors, including respondent, would be permitted to charge for their services. He concluded that he had been restrained from providing his chiropractic services to the public freely and fully, and that would-be recipients of chiropractic services had been deprived of the benefits of competition. Respondent requested, *inter alia*, declaratory and injunctive relief against ULL's continued use of NYSCA's Peer Review Committee in evaluating policyholders' claims.

After extensive discovery, the District Court granted petitioners' motion for summary judgment dismissing respondent's complaint, concluding that ULL's use of NYSCA's Peer Review Committee was exempted from antitrust scrutiny by the McCarran-Ferguson Act. App. to Pet. for Cert. in No. 81–389, pp. 20a–37a. The court noted that three requirements must be met in order to obtain the McCarran-Ferguson exemption: The challenged practices (1) must constitute the "business of insurance," (2) must be regulated by state law, and (3) must not amount to a "boycott, coercion, or intimidation." *Id.*, at 27a–28a. In the court's view, all three of these requirements were satisfied in the present case. In particular, the court held that petitioners' peer review practices constituted the "business of insurance" because they served "to define the precise extent of ULL's

---

[3] 15 U. S. C. § 1, which provides in pertinent part that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. . . ."

contractual obligations . . . under [its] policies." *Id.*, at 29a–30a. Moreover, the court determined that the peer review practices "involve[d] the spreading of risk, an indispensable element of the 'business of insurance.'" *Id.*, at 30a.[4] Respondents' Sherman Act claim was accordingly dismissed with prejudice.

The Court of Appeals for the Second Circuit reversed. 650 F. 2d 387 (1981). Relying upon this Court's recent opinion in *Group Life & Health Ins. Co.* v. *Royal Drug Co.*, 440 U. S. 205 (1979), the Court of Appeals concluded that the District Court had erred in holding that ULL's use of NYSCA's Peer Review Committee constituted the "business of insurance."[5] Accordingly, the Court of Appeals remanded the action for further proceedings. We granted certiorari to resolve a conflict among the Courts of Appeals on the question presented.[6] 454 U. S. 1052 (1981).

---

[4] The court then turned to the Act's second requirement, that the challenged practices be "regulated by state law." The court held that that requirement had been met, as well, observing that New York had "enacted a pervasive scheme of regulation and supervision of insurance," had prohibited "the unfair settlement of claims," and had proscribed "the conduct alleged in the complaint" in its state antitrust law, the Donnelly Act, which by its terms applied to insurers. App. to Pet. for Cert. in No. 81–389, pp. 31a–32a. Finally, the court determined that respondent had neither alleged a "boycott" on petitioners' part, nor offered evidentiary support for such a claim. *Id.*, at 33a–35a. The court thus concluded that the Act's third requirement was satisfied in the present case, and that petitioners' actions were consequently "exempt from application of the antitrust laws." *Id.*, at 36a.

[5] Since it reached this conclusion, the Court of Appeals did not definitively address the other holdings of the District Court. See n. 4, *supra.* The court did note, however, that petitioner NYSCA did not itself "appear to be regulated by state law in the manner § 2(b) requires." 650 F. 2d, at 390, n. 5.

[6] As noted by the Court of Appeals, *id.*, at 395, n. 13, the decision below is contrary to that of the Court of Appeals for the Fourth Circuit "in a factually identical case." See *Bartholomew* v. *Virginia Chiropractors Assn.*, 612 F. 2d 812 (1979).

## II

The only issue before us is whether petitioners' peer review practices are exempt from antitrust scrutiny as part of the "business of insurance." "It is axiomatic that conduct which is not exempt from the antitrust laws may nevertheless be perfectly legal." *Group Life & Health Ins. Co. v. Royal Drug Co., supra,* at 210, n. 5. Thus in deciding these cases we have no occasion to address the merits of respondent's Sherman Act claims. However, the Sherman Act does express a "longstanding congressional commitment to the policy of free markets and open competition." *Community Communications Co. v. Boulder,* 455 U. S. 40, 56 (1982); see also *United States v. Topco Associates, Inc.,* 405 U. S. 596, 610 (1972). Accordingly, our precedents consistently hold that exemptions from the antitrust laws must be construed narrowly. *FMC v. Seatrain Lines, Inc.,* 411 U. S. 726, 733 (1973). This principle applies not only to implicit exemptions, see *Group Life & Health Ins. Co. v. Royal Drug Co., supra,* at 231, but also to express statutory exemptions, see *United States v. McKesson & Robbins, Inc.,* 351 U. S. 305, 316 (1956). In *Royal Drug, supra,* this Court had occasion to reexamine the scope of the express antitrust exemption provided for the "business of insurance" by § 2(b) of the McCarran-Ferguson Act. We hold that decision of the question before us is controlled by *Royal Drug.*

The principal petitioner in *Royal Drug* was a Texas insurance company, Blue Shield, that offered policies entitling insured persons to purchase prescription drugs for $2 each from any pharmacy participating in a "Pharmacy Agreement" with Blue Shield; policyholders were also allowed to purchase prescription drugs from a nonparticipating pharmacy, but in that event they would have to pay full price for the drugs and would be reimbursed by Blue Shield for only a part of that price. Blue Shield offered Pharmacy Agreements to all licensed pharmacies in Texas, but participating pharmacies were required to sell prescription drugs to Blue

Shield's policyholders for $2 each, and were reimbursed only for their cost in acquiring the drugs thus sold. "Thus, only pharmacies that [could] afford to distribute prescription drugs for less than this $2 markup [could] profitably participate in the plan." 440 U. S., at 209 (footnote omitted).

Respondents in *Royal Drug* were the owners of nonparticipating pharmacies. They sued Blue Shield and several participating pharmacies under § 1 of the Sherman Act, alleging that the Pharmacy Agreements were the instrument by which Blue Shield had conspired with participating pharmacies to fix the retail prices of prescription drugs. Respondents also alleged that the Agreements encouraged Blue Shield's policyholders to avoid nonparticipating pharmacies, thus constituting an unlawful group boycott. The District Court granted summary judgment to Blue Shield and the other petitioners, holding that the challenged Agreements were exempt under § 2(b) of the McCarran-Ferguson Act. But the Court of Appeals disagreed, holding that the Agreements were not the "business of insurance" within the meaning of that Act, and reversed. 440 U. S., at 210. This Court affirmed. Looking to "the structure of the Act and its legislative history," *id.*, at 211, the Court discussed three characteristics of the business of insurance that Congress had intended to exempt through § 2(b).

First, after noting that one "indispensable characteristic of insurance" is the "spreading and underwriting of a policyholder's risk," *id.*, at 211–212,[7] the Court observed that parts

---

[7] As the Court explained:

" 'It is characteristic of insurance that a number of risks are accepted, some of which involve losses, and that such losses are spread over all the risks so as to enable the insurer to accept each risk at a slight fraction of the possible liability upon it.' 1 G. Couch, Cyclopedia of Insurance Law § 1:3 (2d ed. 1959). See also R. Keeton, Insurance Law § 1.2(a) (1971) ('Insurance is an arrangement for transferring and distributing risk'); 1 G. Richards, The Law of Insurance § 2 (W. Freedman 5th ed. 1952)." 440 U. S., at 211 (footnote omitted).

of the legislative history of the McCarran-Ferguson Act "strongly suggest that Congress understood the business of insurance to be the underwriting and spreading of risk," *id.*, at 220–221. The Court then dismissed Blue Shield's contention that its Pharmacy Agreements involved such activities.

> "The Pharmacy Agreements . . . are merely arrangements for the purchase of goods and services by Blue Shield. By agreeing with pharmacies on the maximum prices it will pay for drugs, Blue Shield effectively reduces the total amount it must pay to its policyholders. The Agreements thus enable Blue Shield to minimize costs and maximize profits. Such cost-savings arrangements may well be sound business practice, and may well inure ultimately to the benefit of policyholders in the form of lower premiums, but they are not the 'business of insurance.'" *Id.*, at 214 (footnote omitted).

Second, the Court identified "the contract between the insurer and the insured" as "[a]nother commonly understood aspect of the business of insurance." *Id.*, at 215. The Court noted that, in enacting the McCarran-Ferguson Act, Congress had been concerned with the "'relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement—these were the core of the "business of insurance."'" *Id.*, at 215–216, quoting *SEC* v. *National Securities, Inc.*, 393 U. S. 453, 460 (1969). The Court then rejected Blue Shield's argument that its Pharmacy Agreements were so closely related to the "reliability, interpretation, and enforcement" of its policies as to fall within the intended scope of § 2(b): "This argument . . . proves too much." 440 U. S., at 216.

> "At the most, the petitioners have demonstrated that the Pharmacy Agreements result in cost savings to Blue Shield which may be reflected in lower premiums if the cost savings are passed on to policyholders. But, in that sense, every business decision made by an insurance company has some impact on its reliability, its rate-

making, and its status as a reliable insurer . . . [and thus] could be included in the 'business of insurance.' Such a result would be plainly contrary to the statutory language, which exempts the 'business of insurance' and not the 'business of insurance companies.'" *Id.*, at 216–217.

Finally, the Court noted that in enacting the McCarran-Ferguson Act, "the primary concern of both representatives of the insurance industry and the Congress was that cooperative ratemaking efforts be exempt from the antitrust laws." *Id.*, at 221. This was so because of "the widespread view that it [was] very difficult to underwrite risks in an informed and responsible way without intra-industry cooperation." *Ibid.* The Court was thus reluctant to extend the § 2(b) exemption to the case before it, "because the Pharmacy Agreements involve parties wholly outside the insurance industry." *Id.*, at 231.

> "There is not the slightest suggestion in the legislative history that Congress in any way contemplated that arrangements such as the Pharmacy Agreements in this case, which involve the mass purchase of goods and services from entities outside the insurance industry, are the 'business of insurance.'" *Id.*, at 224 (footnote omitted).

In sum, *Royal Drug* identified three criteria relevant in determining whether a particular practice is part of the "business of insurance" exempted from the antitrust laws by § 2(b): *first*, whether the practice has the effect of transferring or spreading a policyholder's risk; *second*, whether the practice is an integral part of the policy relationship between the insurer and the insured; and *third*, whether the practice is limited to entities within the insurance industry. None of these criteria is necessarily determinative in itself, but examining the arrangement between petitioners NYSCA and ULL with respect to all three criteria, we do not hesitate to conclude that it is not a part of the "business of insurance."

Plainly, ULL's use of NYSCA's Peer Review Committee plays no part in the "spreading and underwriting of a policy-holder's risk." *Group Life & Health Ins. Co.* v. *Royal Drug Co.*, 440 U. S., at 211. Both the "spreading" and the "underwriting" of risk refer in this context to the transfer of risk characteristic of insurance. See n. 7, *supra.* And as the Court of Appeals below observed:

> "The risk that an insured will require chiropractic treatment has been transferred from the insured to [ULL] by the very purchase of insurance. Peer review takes place only after the risk has been transferred by means of the policy, and then it functions only to determine whether the risk of the entire loss (the insured's cost of treatment) has been transferred to [ULL]—that is, whether the insured's loss falls within the policy limits." 650 F. 2d, at 393.

Petitioner ULL argues that the Court of Appeals' analysis is "semantic and unrealistic." Brief for Petitioner ULL 17. Petitioner reasons that "[i]t is inconceivable that Congress would have included risk transfer within the 'business of insurance' but excluded a device that helps 'determine whether the risk . . . has been transferred' and acts as 'an aid in determining the scope of the transfer.'" *Ibid.* We find no merit in this argument, because the challenged peer review arrangement is logically and temporally unconnected to the transfer of risk accomplished by ULL's insurance policies. The transfer of risk from insured to insurer is effected by means of the contract between the parties—the insurance policy—and that transfer is complete at the time that the contract is entered. See 9 G. Couch, Cyclopedia of Insurance Law §§ 39:53, 39:63 (2d ed. 1962). If the policy limits coverage to "necessary" treatments and "reasonable" charges for them, then that limitation is the measure of the risk that has actually been transferred to the insurer: To the extent that

the insured pays unreasonable charges for unnecessary treatments, he will not be reimbursed, because the risk of incurring such treatments and charges was never transferred to the insurer, but was instead always retained by the insured. Petitioner's argument contains the unspoken premise that the transfer of risk from an insured to his insurer actually takes place not when the contract between those parties is completed, but rather only when the insured's claim is settled. This premise is contrary to the fundamental principle of insurance that the insurance policy defines the scope of risk assumed by the insurer from the insured. See *id.*, § 39:3; R. Keeton, Insurance Law § 5.1(a) (1971).

Turning to the second *Royal Drug* criterion, it is clear that ULL's use of NYSCA's Peer Review Committee is not an integral part of the policy relationship between insurer and insured. In the first place, the challenged arrangement between ULL and NYSCA is obviously distinct from ULL's contracts with its policyholders. In this sense the challenged arrangement resembles the Pharmacy Agreements in *Royal Drug*. There the Court rejected the proposition that the Agreements were "'between insurer and insured.'" *Group Life & Health Ins. Co.* v. *Royal Drug Co., supra,* at 215, quoting *SEC* v. *National Securities, Inc.*, 393 U. S., at 460. Rather, it recognized those Agreements as "separate contractual arrangements between Blue Shield and pharmacies engaged in the sale and distribution of goods and services other than insurance." 440 U. S., at 216. Similarly, ULL's use of NYSCA's Peer Review Committee is a separate arrangement between the insurer and third parties not engaged in the business of insurance.

Petitioner ULL argues that the challenged peer review practices satisfy this criterion because peer review "directly involves the 'interpretation' and 'enforcement' of the insurance contract." Brief for Petitioner ULL 16. But this argument is essentially identical to one made and rejected in

*Royal Drug.* Blue Shield there contended that its Pharmacy Agreements "so closely affect[ed] the 'reliability, interpretation, and enforcement' of the insurance contract . . . as to fall within the exempted area." 440 U. S., at 216 (footnote omitted). This Court noted, however:

> "The benefit promised to Blue Shield policyholders is that their premiums will cover the cost of prescription drugs except for a $2 charge for each prescription. So long as that promise is kept, policyholders are basically unconcerned with arrangements made between Blue Shield and participating pharmacies." *Id.*, at 213–214 (footnotes omitted).

Similarly, when presented with policyholder claims for reimbursement, ULL must decide whether the claims are covered by its policies. But these decisions are entirely ULL's, and its use of NYSCA's Peer Review Committee as an aid in its decisionmaking process is a matter of indifference to the policyholder, whose only concern is *whether* his claim is paid, not *why* it is paid. As in *Royal Drug*, petitioners have shown, at the most, that the challenged peer review practices result in "cost savings to [ULL] which may be reflected in lower premiums if the cost savings are passed on to policyholders." *Id.*, at 216. To grant the practices a § 2(b) exemption on such a showing "would be plainly contrary to the statutory language, which exempts the 'business of insurance' and not the 'business of insurance companies.'" · *Id.*, at 217.

Finally, as respects the third *Royal Drug* criterion, it is plain that the challenged peer review practices are not limited to entities within the insurance industry. On the contrary, ULL's use of NYSCA's Peer Review Committee inevitably involves third parties wholly outside the insurance industry—namely, practicing chiropractors. Petitioners do not dispute this fact, but instead deprecate its importance. They argue that we should not conclude "that ULL's use of the peer review process is outside the scope of the 'business

of insurance' simply because NYSCA is not an insurance company." Brief for Petitioner ULL 25. In petitioners' view:

> "There is nothing in the McCarran-Ferguson Act that limits the 'business of insurance' to the business of insurance companies. As this Court has stated, '[the Act's] language refers not to the persons or companies who are subject to state regulation, but to laws "regulating the *business* of insurance."' *National Securities*, 393 U. S. at 459." *Ibid.* (emphasis in original of quoted opinion).

Asserting that "the [New York] Superintendent of Insurance effectively can regulate the peer review process through his authority over the claims adjustment procedures of ULL," *id.*, at 26, petitioners conclude that the process is part of the "business of insurance" despite the necessary involvement of third parties outside the insurance industry.

We may assume that the challenged peer review practices need not be denied the § 2(b) exemption *solely* because they involve parties outside the insurance industry. But the involvement of such parties, even if not dispositive, constitutes part of the inquiry mandated by the *Royal Drug* analysis. As the Court noted there, § 2(b) was intended primarily to protect *"intra-*industry cooperation" in the underwriting of risks. 440 U. S., at 221 (emphasis added). Arrangements between insurance companies and parties outside the insurance industry can hardly be said to lie at the center of that legislative concern. More importantly, such arrangements may prove contrary to the spirit as well as the letter of § 2(b), because they have the potential to restrain competition in noninsurance markets. Indeed, the peer review practices challenged in the present cases assertedly realize precisely this potential: Respondent's claim is that the practices restrain competition in a provider market—the market for chiropractic services—rather than in an insurance market. App. 8a. Thus we cannot join petitioners in depreciating the

fact that parties outside the insurance industry are intimately involved in the peer review practices at issue in these cases.[8]

## III

In sum, we conclude that ULL's use of NYSCA's Peer Review Committee does not constitute the "business of insurance" within the meaning of § 2(b) of the McCarran-Ferguson Act.[9]  The judgment of the Court of Appeals is accordingly

*Affirmed.*

JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE and JUSTICE O'CONNOR join, dissenting.

Purporting to rely upon our recent decision in *Group Life & Health Ins. Co.* v. *Royal Drug Co.*, 440 U. S. 205 (1979),

---

[8] The premise of the dissent is that NYSCA's Peer Review Committee actually constitutes "the claims adjustor" in these cases.  See *post,* at 137. From this premise the dissent reasons that since "claims adjustment is part and parcel of the 'business of insurance' protected by the McCarran-Ferguson Act," *post,* at 138, it necessarily follows that the peer review practices at issue in these cases must enjoy the Act's exemption.  The fatal flaw in this syllogism is that NYSCA's Peer Review Committee is *not* the claims adjustor.  As the Court of Appeals noted: "Opinions of the committee are not binding unless the parties agree beforehand that they will be." 650 F. 2d, at 388.  Thus in a case such as the present ones, ULL is perfectly free to disregard the Committee's evaluation.  Even if ULL were to act upon the Committee's opinion, the nonbinding nature of the Committee's evaluation means that, at most, peer review is merely ancillary to the claims adjustment process.  We see no reason that such ancillary activities must necessarily enjoy the McCarran-Ferguson exemption from the antitrust laws.  Unlike activities that occur wholly within the insurance industry—such as the claims adjustment process itself—the ancillary peer review practices at issue in these cases "involve parties wholly outside the insurance industry."  See *Group Life & Health Ins. Co.* v. *Royal Drug Co.*, 440 U. S., at 231.  Thus peer review falls afoul of the third *Royal Drug* criterion in a way in which pure claims adjustment activities cannot.

[9] This conclusion renders it unnecessary for us to address the questions whether the conduct challenged in respondent's complaint was "regulated by state law" or constituted a "boycott, coercion, or intimidation."  See n. 5, *supra.*

the Court today exposes to antitrust liability an aspect of the business of insurance designed to promote fair and efficient claims settlement. The Court reaches this conclusion by determining that the peer review process does not spread risk, is not an integral part of the insurance relationship, and is not limited to entities within the insurance industry. Because I find the claims adjustment function of the Peer Review Committee to be at the heart of the relationship between insurance companies and their policyholders, I conclude that such committees are clearly within the sphere of insurance activity which the McCarran-Ferguson Act intended to protect from the effect of the antitrust laws.[1] This conclusion finds support in the legislative history of the Act and in *Royal Drug* and its predecessors.

For many years statutes such as the Sherman Act were thought not applicable to the business of insurance, this Court having held in *Paul* v. *Virginia*, 8 Wall. 168, 183 (1869), that "[i]ssuing a policy of insurance is not a transaction of commerce." When this Court held in *United States* v. *South-Eastern Underwriters Assn.*, 322 U. S. 533 (1944), that the business of insurance was a part of interstate commerce subject to the Sherman Act, Congress responded quickly to reestablish the preeminence of States in regulating such business. Congress' response—the McCarran-Ferguson Act—sought primarily to protect the contractual relationship between the insurer and the insured:

> "Under the regime of *Paul* v. *Virginia, supra,* States had a free hand in regulating the dealings between insurers and their policyholders. Their negotiations, and the contract which resulted, were not considered commerce and were, therefore, left to state regulation. The

---

[1] Since the Court declines to reach the question of whether petitioners' Committee is regulated by state law as required by the McCarran-Ferguson Act, I likewise do not discuss it. I note, however, that the District Court found petitioners' Committee to be so regulated. App. to Pet. for Cert. in No. 81–389, pp. 31a–32a.

*South-Eastern Underwriters* decision threatened the
continued supremacy of the States in this area. The
McCarran-Ferguson Act was an attempt to turn back
the clock, to assure that the activities of insurance com-
panies in dealing with their policyholders would remain
subject to state regulation." *SEC* v. *National Securi-
ties, Inc.,* 393 U. S. 453, 459 (1969).

We recognized this congressional purpose in *Royal Drug:*

> " 'The relationship between insurer and insured, the type
> of policy which could be issued, its reliability, interpreta-
> tion, and enforcement—these were the core of the "busi-
> ness of insurance." Undoubtedly, other activities of
> insurance companies relate so closely to their status as
> reliable insurers that they too must be placed in the
> same class. But whatever the exact scope of the statu-
> tory term, it is clear where the focus was—it was on the
> relationship between the insurance company and the
> policyholder.' " *Group Life & Health Ins. Co.* v. *Royal
> Drug Co., supra,* at 215–216 (quoting *SEC* v. *National
> Securities, Inc., supra,* at 460).

Thus, whatever else was said in *Royal Drug* about the indis-
pensable characteristic of risk-spreading, the Court found the
contractual relationship between the insurer and the insured
to be the essence of the "business of insurance."

Central to this contractual relationship is the process of
claims adjustment—the determination of the actual payments
to be made to the insured for losses covered by the insurance
contract. The key representation of the insurance company
and the principal expectation of the policyholder is that
prompt payment will be made when the event insured against
actually occurs. As one commentator has stated:

> "Up until the time there is a claim and a payment is
> made, the only tangible evidence of insurance is a piece
> of paper. In other words, the real product of insurance

is the claims proceeds.  Selection of the prospect, qualifying him for coverage that suits his needs, delivery of a policy, collecting premiums for perhaps years, making changes in coverage to meet changing situations, all of these are but preambles to the one purpose for which the insurance was secured, namely to collect dollars if and when an unforeseen event takes place."  J. Wickman, Evaluating the Health Insurance Risk 57 (1965).[2]

It is the claims adjustor—in this case petitioners' Peer Review Committee—which determines whether and to what extent an insured's losses will be covered.  The Court thus plainly errs when it concludes that the role of petitioners' Peer Review Committee "is not an integral part of the policy relationship between insurer and insured," *ante*, at 131, and "is a matter of indifference to the policyholder."  *Ante*, at 132.  Few insurance matters could be of greater importance to policyholders than whether their claims will be paid, and it is the Peer Review Committee which in effect makes that determination.  Being a critical component of the relation-

---

[2] Other commentators agree with this assessment of the importance of claims settlement:

"The adjustment (including payment) of claims represents the final act in the insurance process.  The payment of a claim by an insurance company brings the insurance contract 'to life' in a fashion far more vivid than does any other single act in connection with the purchase, issuance, and maintenance of the contract."  Butler, Loss Adjustment in Fire Insurance, in Property and Liability Insurance Handbook 219 (J. Long & D. Gregg eds. 1965).

"Claim administration is the last link in the process of insurance—a process that begins with actuarial analysis and continues through sales, underwriting, investment, and policy service. . . . [T]he expectation of the policyowner that an insurer is willing to meet its obligations, through claims administration, is an important part in the decision to purchase insurance.  Indeed, it is the claim administration function that delivers on the product sold to the policyowner."  C. Cissley, Claim Administration: Principles and Practices iii (1980).

ship between an insurer and an insured, claims adjustment is part and parcel of the "business of insurance" protected by the McCarran-Ferguson Act.[3]

This conclusion finds support in a source of guidance completely disregarded by the Court—the legislative history of McCarran-Ferguson. The passage of the Act was preceded by the introduction in the Senate Committee of a report and a bill prepared by the National Association of Insurance Commissioners. "The views of the NAIC are particularly significant, because the Act ultimately passed was based in large part on the NAIC bill." *Group Life & Health Ins. Co.* v. *Royal Drug Co.*, 440 U. S., at 221 (footnote omitted). Included in that bill were seven specific insurance practices to which the Sherman Act was not to apply, and to which the Court in *Royal Drug* looked for guidance as to the meaning of the phrase "business of insurance." See *id.*, at 222. Among those seven protected practices was the process of claims adjustment: "the said Sherman Act shall not apply . . . to any cooperative or joint service, *adjustment, investigation, or inspection agreement* relating to insurance." 90 Cong. Rec. A4406 (1944) (emphasis added). Other statements in the legislative history support the conclusion that claims adjustment was to be protected:

---

[3] Apparently unable to discern the difference between a mere method of paying a claim and the more fundamental process of determining whether a claim is covered by the insurance agreement, the Court finds that petitioners' peer review procedure "resembles the Pharmacy Agreements in *Royal Drug*." *Ante*, at 131. But the Pharmacy Agreement at issue in *Royal Drug* was simply a *method* of reimbursing policyowners for medication expenses. The policyowners could obtain medication from participating pharmacies simply by paying the amount that otherwise would not be covered by the insurance plan. The pharmacies thus constituted nothing more than in-kind dispensers of insurance payments; they played no role whatsoever in the more fundamental process of assessing the validity of a claim and determining the amount to be paid. Peer review committees, which fulfill such a fundamental role, are thus quite unlike the arrangements considered by the Court in *Royal Drug*.

"[W]e come squarely to the question of whether State regulation is adequate to handle insurance, or whether that business should be subject to the provisions of the antitrust laws. . . . A great number of fire-insurance companies have cooperated in mutual agreement—and of necessity—through the Southeastern Underwriters Association and rating bureaus, adjusting policy rates to risks, classifying insurable property either in co-insurance or in re-insurance, *making appraisals of losses*, and working out systems of inspection to improve protection against fires. All of this has been done with splendid success. It would be a pity indeed, after all these years, to have the government intervene. The business of insurance involves long contracts. The fidelity of performance of those contracts will not brook intervention." *Id.*, at 6530 (remarks of Rep. Satterfield) (emphasis added).

See also *id.*, at 6543 (remarks of Rep. Jennings); *id.*, at 6550–6551 (remarks of Rep. Ploeser).

The role of claims adjustment in the insurance relationship and the legislative history of the Act thus unmistakably demonstrate that claims settlement procedures such as petitioners' Peer Review Committee were to be accorded protection from the antitrust laws as the "business of insurance." Few practices followed by insurance companies today present a fairer or more efficient means of claims resolution than professional peer review committees. Insurance claimants seek reimbursement for virtually every form of medical treatment and care, and determining the reasonableness and necessity of such expenses requires the expertise of a practicing physician. Because the entire spectrum of human ailments are involved, the views of one physician are seldom sufficient; specialists from many fields of medicine must be consulted. Few if any insurance companies can afford to staff their claims settlement departments with such a broad range of physicians. The companies thus must either make less than

satisfactory claims determinations, or must turn to an outside group of experts such as petitioners' Committee.

Although the Court protests that its decision says nothing about petitioners' antitrust liability, there can be little doubt that today's decision will vastly curtail the peer review process. Few professionals or companies will be willing to expose themselves to possible antitrust liability through such activity. The Court thus not only misreads the McCarran-Ferguson Act and our prior precedents, but also eliminates an aspect of the American insurance industry which has long redounded to the benefit of insurance companies and policyholders alike.