ESCROW DISBURSEMENT INSURANCE AGENCY, INC., Plaintiff,

v.

AMERICAN TITLE AND INSURANCE CO., INC., et al., Defendants.

No. 76–6109–CIV–EPS.

United States District Court,
S.D. Florida,
Civil Division.

Nov. 9, 1982.

Rod Tennyson, Ombres, Powell, Tennyson & St. John, P.A., West Palm Beach, Fla., Coleman R. Rosenfield, Hollywood, Fla., David E. Graham, Graham, Hodge & Larson, P.A., Fort Lauderdale, Fla., Gerald F. Richman, Floyd, Pearson, Stewart, Richman, Greer & Weil, P.A., Miami, Fla., Stephen Rubin, Holland & Knight, Washington, D.C., for plaintiff.

Patrick A. Barry, English, McCaughan & O'Bryan, Fort Lauderdale, Fla., John G. Graybeal, Foley, Lardner, Hollabaugh & Jacobs, Washington, D.C., for Lawyers Title.

Delbridge L. Gibbs, Marks, Gray, Conroy & Gibbs, P.A., Jacksonville, Fla., Joseph W. Gelb, Weil, Gotshal & Manges, New York City, for Title & Trust Co. of Florida.

R.L. Edwards, Kimbrell, Hamann, Jennings, Womack & Carlson, Miami, Fla., for Commonwealth Land Title Ins. Corp.

Theodore C. Taub, Taub & Williams, Tampa, Fla., for Pioneer Nat.

William H. Adams, III, Mahoney, Hadlow & Adams, Jacksonville, Fla., for Title Ins. Co. of Minnesota.

## OPINION AND ORDER REINSTATING THE MONOPOLY COUNT OF THE COMPLAINT, COUNT II

SPELLMAN, District Judge.

THIS CAUSE came before the Court on Plaintiff's Motion for Clarification and Reinstatement of the Monopoly Count, Count II, of the Complaint.

## I. FACTS

Plaintiff, Escrow Disbursement Insurance Agency, Inc. (EDIA), filed suit on March 16, 1976, alleging violations of both sections of the Sherman Act, 15 U.S.C. §§ 1 & 2. In Count II of that Complaint, it was alleged that the Defendants—title insurance underwriters—monopolized, attempted to monopolize, and conspired to monopolize the market for insurance.

The acts complained of occurred in connection with the marketing of an insurance policy that purportedly protected lenders and purchasers of real property from loss occasioned by newly recorded encumbrances on acquired land, appearing of record between the time of the final title search and the final recording of the mortgage or deed of conveyance.

Plaintiff had begun marketing this insurance policy, designed to cover the alleged "gap" in the coverage of a normal title insurance policy, in 1975. The marketing firm, EDIA, is now defunct. Plaintiff coined the name "gap insurance" for the above-mentioned policy. Plaintiff asserts that this policy was casualty insurance according to the definitions in the Florida Insurance Code. At the time in question, title insurance companies were forbidden to issue casualty insurance. *See* Fla.Stat. § 627.784 *as amended by* § 627.784 (1981). Plaintiff asserts therefore that title insurance companies were prevented by state law from insuring against loss incurred during this gap period. Plaintiff claims that despite this illegality, Defendants individually and collectively misrepresented the coverage of Plaintiff's insurance policy and their own for the purpose of eliminating EDIA as competition.

Defendants argue a variety of alternatives. First, they argue that there is no gap, and therefore no risk. This argument is based upon the assertion that it is the practice of title insurance companies to make an extra check of the state of the title by telephone, after the title binder has been issued, and before the money is disbursed. Second, the Defendants argue that the gap risk is insignificant. In either case, Defendants assert that the gap policy is a sham.

Third, Defendants claim that title insurance companies have since the 1940s offered protection for this gap period through the use of "insured closing service letters" or "gap letters." These letters, allegedly issued as a matter of routine to selected customers, usually commercial lending institutions, concern the underwriter's responsi-

bility for the acts of the independent title agent or approved attorney. The basic purpose of the letter was stated to be to confirm for the prospective insured that the title agent or attorney is in fact an agent of the underwriter and to express the extent of the agency relationship.

The Complaint alleges that the Defendants conspired to prevent the success of the Plaintiff's insurance policy and that part of the means of achieving this goal was the individual and group use of the gap letters by the title insurance industry. It was further alleged that false information was spread by the Defendants about EDIA and its policy. The purpose and effect, historically and currently, of the gap letters is not clear. Resolution of this issue is central to this action.

## II. PROCEDURAL HISTORY OF THE MONOPOLY COUNT

Defendants, on July 10, 1976, moved to dismiss the complaint for lack of subject matter jurisdiction and for failure to state a claim upon which relief may be granted. The primary basis for the motion was a claim of immunity from the Sherman Act under the McCarran-Ferguson Act, 15 U.S.C. § 1011–1015. Additionally immunity was claimed under the Noerr-Pennington doctrine, derived from *Eastern Railroads Presidents Conference v. Noerr Motor Freight,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and *United Mine Workers of America v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).

The motion was granted with respect to the monopoly count, Count II, of the Complaint. A close study of the opinion and order issued regarding that motion reveals the following bases for the ruling:

(1) the McCarran-Ferguson Act applied to title insurance (citing *Crawford v. American Title Insurance Co.,* 518 F.2d 217 (5th Cir.1975));

(2) the acts complained of were "the business of insurance" within the meaning of § 1012(b) of the McCarran Act (citing *S.E.C. v. National Securities, Inc.,* 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969);

*American General Insurance Co. v. F.T.C.,* 359 F.Supp. 887 (S.D.Tex.1973); *Maple Flooring Manufacturers' Association v. United States,* 268 U.S. 563, 45 S.Ct. 578, 69 L.Ed. 1093 (1925));

(3) the acts complained of were "regulated by state law" within the meaning of § 1012(b) of the McCarran Act and were thus immune from the Sherman Act (to the extent that they did not involve boycott, coercion, or intimidation within the meaning of § 1013(b) of the McCarran Act) (citing scattered sections of the Florida Insurance Code and *Crawford, supra*);

(4) the acts complained of that were exempt from the McCarran Act immunity because they involved boycott, coercion, or intimidation were at least prima facie not entitled to immunity under the Noerr-Pennington doctrine either; thus the allegations of boycott, coercion, and intimidation were sufficient to survive the motion to dismiss (citing *Noerr, supra,* and *Pennington, supra*).

The court held that the only viable claim stated in the complaint was for "conspiracy to boycott, coerce or intimidate"—the only conduct exempt from McCarran Act immunity. Plaintiff asserts in its motion to reinstate that the 1976 order relating to the motion to dismiss did not, in fact, dismiss the monopoly count. Alternatively Plaintiff argues that the scope of McCarran Act immunity has narrowed since 1976, requiring a reevaluation of the monopoly claims.

Although the order is not express in regard to the dismissal of the monopoly count, the implication throughout is clear that the court did indeed dismiss Count II of the complaint. The monopoly claims were not addressed again until the court ruled on Defendants' motion for summary judgment in 1981. The claims were not discussed in the motion itself, or in the response thereto, but the court nonetheless was constrained to state in the summary judgment order that the effect of the 1976 order of dismissal was to dismiss Count II of the complaint.

The basis for the motion for summary judgment was the Defendants' claim of im-

munity from any acts of boycott, coercion, or intimidation under the Noerr-Pennington doctrine. This doctrine permits the lobbying of state officials by special interest groups for economic benefits to the exclusion of others without fear of incurring antitrust liability.

The court held that the determination of motive and intent necessary to distinguish between protected and unprotected activity under the Noerr-Pennington doctrine was for the jury, as it was a question of fact. The issue was therefore incapable of resolution on a motion for summary judgment. The court found that the record made out a sufficient case for improper motive to survive the summary procedure.

Nearly one year after the ruling on the summary judgment, nearly six years after the ruling on the motion to dismiss, and soon after the case was transferred to this court, Plaintiff moved to "clarify" or to "reinstate" the monopoly count of the complaint. There are many issues raised by this motion. This court deems the issues now presented to be as follows:

I. What is the precedential value of the previous rulings on the motion to dismiss and the motion for summary judgment in the continuing trial of the same matter if the applicable law has changed in the interim?

II. Are the allegations made in the complaint within the purview of the Sherman Act?

A. Are the actions complained of entitled to any type of immunity from the Sherman Act?

1. Are the actions complained of entitled to immunity under the McCarran-Ferguson Act?

  a. Are the actions complained of "the business of insurance"?

  b. Are the actions complained of "regulated by state law"?

  i. Is it necessary, or even appropriate, for this court to scrutinize the adequacy or effectiveness of the state regulation of the actions to determine if the regulation is sufficient to trigger immunity under the McCarran Act?

  c. Are the actions complained of in the nature of boycott, coercion, or intimidation and, therefore, not entitled to immunity under the McCarran Act?

2. Are the actions complained of entitled to immunity under the Noerr-Pennington doctrine?

## III. LAW

### A. Standard for Dismissal

The standard for dismissal to which the monopoly count was subject in the 1976 proceeding has not changed since that time. It has been stated pursuant to Fed.R.Civ.P. 12(b)(6), that dismissal is appropriate only when "it appears to a certainty that plaintiff would not be entitled to recover under any state of facts which could be proved in support of his claim" *Cook & Nichol, Inc. v. Plimsoll Club,* 451 F.2d 505, 506 (5th Cir. 1970). *See also Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Moreover, the facts must be construed in the light most favorable to the plaintiff. *Bodie v. Connecticut,* 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971).

### B. Definition of Monopoly Power

Monopoly power has been defined by case law to mean the power to control price or to exclude competition. P. Areeda, *Antitrust Analysis* 147 (3d ed. 1981). The offense of monopolization has been defined as "[the deliberate pursuit of] a course of market conduct through which ... [one] has obtained or maintained power to control price or exclude competition in some part of the trade or commerce covered by the act." L. Sullivan, *Handbook of the Law of Antitrust* 29 (1977) (citations omitted).

Sullivan explains further:

"The offense involves two distinct elements. The first is a matter of capacity—the possession of power to control prices or exclude competition. But the mere possession of such monopoly power does not violate the act. There is also a second element to the offense, that of conduct or intent. To be in violation the firm must be shown either to have

obtained its power by deliberately pursuing a course of conduct which had the effect of expanding or maintaining power, or to have formed a specific intent to maintain its power by such conduct. That both elements, power to control price and to exclude competitors and some element of deliberateness, must be shown has long been settled, though the law has developed and changed significantly in respect to the way power is identified, and the degree of deliberateness which must be shown.

*Id.* at 29–30 (footnotes omitted).

Monopoly violations are not limited to the activities of single firms. The power may be exercised by two or more firms that act concertedly to obtain and exert power. *Id.* at 152.

### C. The McCarran-Ferguson Act

The McCarran-Ferguson Act, 15 U.S.C. §§ 1011–1015, provides certain insurance activities with a degree of immunity from the Sherman Act, particularly from section 2 of that Act regarding monopoly.

The McCarran Act provides in pertinent part that:

No Act of Congress shall be construed to invalidate impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance ... *Provided,* that ... the Sherman Act, ... the Clayton Act, and the ... Federal Trade Commission Act ... Shall be applicable to the business of insurance to the extent that such business is not regulated by State law.

15 U.S.C. § 1012(b).

Thus, under the McCarran Act, actions that are "the business of insurance" are immune from the Sherman Act "to the extent that such business is ... regulated by State law." There is an exception to this immunity, however, in 15 U.S.C. § 1013(b). "Nothing contained in this chapter shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation." *Id.*

This court agrees that the McCarran Act has the potential of providing immunity to the Defendants in this case, as it does concern certain aspects of the title industry; but it is not satisfied that the two prerequisites for immunity under the Act have been established on motion to dismiss.

### 1. The Business of Insurance

In 1976, "the business of insurance" clause of the McCarran Act had been construed to mean the business as between the insurers and their policyholders. *See S.E.C. v. National Securities, Inc., supra,* 393 U.S. at 459–460, 89 S.Ct. at 568. "The relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement—these were the core of the "business of insurance." *Id.* at 460, 89 S.Ct. at 568.

The *National Securities* court went on to state: "But whatever the exact scope of the statutory term, it is clear where the focus was—it was on the relationship between the insurance company and the policyholder. Statutes aimed at protecting or regulating this relationship, directly or indirectly, are laws regulating the "business of insurance." *Id. See also American General, supra* (citing the rule of *National Securities* with approval).

At the time the original order was entered in this case, there was a dearth of case law defining the scope of this phrase as applied to this type of case. During the interval, several significant decisions have been issued that have modified, or constricted, the rule as espoused in *National Securities.* The two most recent decisions from the United States Supreme Court on this issue are *Union Labor Life Insurance Co. v. Pireno,* —— U.S. ——, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1981), and *Royal Drug Co. v. Group Life & Health Insurance Co.,* 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979), affirming 556 F.2d 1375 (5th Cir. 1977).

In *Royal Drug* the court relied upon three criteria to determine whether a particular practice was part of the business of insurance. These three factors were also

relied upon by the Court in *Pireno.* These criteria narrowed and clarified the scope of the McCarran immunity. Because of this significant change in the scope of antitrust immunity, it is appropriate for this court to reexamine the dismissal of the monopoly claims in light of the present state of the law. *See* 1B J. Moore, *Federal Practice* § 0.404[4] (2d ed. 1982).

Following a determination that the doctrine of the "law of the case" does not preclude review of earlier rulings on motions in this proceeding, an examination may be undertaken into substantive legal issues. It is clear the complaint invokes claims pursuant to the Sherman Act. It is also clear that the McCarran Act applies to this situation, potentially providing the Defendants with immunity for their alleged acts. In order to determine if the acts complained of are indeed entitled to immunity, the aforementioned two-pronged test must be employed.

The criteria for determining if the first prong, "the business of insurance," has been satisfied were described in *Pireno, supra* —— U.S. at ——, 102 S.Ct. at 3009 as follows:

(1) whether the activities complained of involved the spreading and underwriting of risk;

(2) whether the activities complained of concerned the contractual relationship between the insurer and the insured; and

(3) whether the activities complained of concerned a practice limited to entities within the insurance industry.

Therefore, a determination must first be made regarding the risk-spreading characteristics of the insured closing service letters, or gap letters. The Defendants concede in their memorandum opposing the motion to reinstate that the function of the letter is not risk-spreading, but is only "akin" to that function. They point out the confusion regarding this aspect of the case by noting that one of the alternative arguments made by Plaintiff is based upon the fact that the letters are an illegal form of casualty insurance and thus do have a risk-spreading aspect.

Further, Defendants argue that there is no gap, therefore no risk; or, alternatively, that the risk is inconsequential. Moreover, they argue that a regular title insurance policy effectively insures against this type of liability, and that such insurance is not prohibited casualty insurance. This court finds that for the purposes of a motion to dismiss for failure to state a claim upon which relief may be granted, Plaintiff has made a prima facie case that insured closing letters do not spread risk.

In regard to the issue of whether the letters relate to the contractual relationship between the insurer and the insured, this court finds that the gap letters potentially affect this relationship, but the question is a mixed one of law and fact. For the purposes of a motion to dismiss, the letters may be said to not fit into this category either.

The issue of the exclusiveness of the practice of issuing gap letters as limited to the title insurance industry is a question of fact. This court must assume for the purposes of a motion to dismiss that nonexclusiveness could be proved, as it is alleged. In summary, it appears quite possible that the issuance of insured closing letters could be outside the immunity provided by the McCarran Act.

### 2. Regulated by State Law

In order to further qualify for the McCarran immunity, and be subject to dismissal for failure to state a claim under the antitrust laws, the activities complained of must also be "regulated by State law." The construction of this phrase is a difficult task.

The Fifth Circuit has handed down a per curiam decision interpreting the phrase "regulated by state law" in *Crawford v. American Title Insurance Co., supra.* *Crawford* involved an action against nine title insurance companies and agents for violations of sections 1 & 2 of the Sherman Act. Plaintiffs alleged an illegal conspiracy to fix prices for the issuance of title insurance policies. Also alleged was monopoliza-

tion, attempted monopolization, and conspiracy to monopolize. Motions to dismiss for lack of subject matter jurisdiction were based upon the McCarran Act.

The court in *Crawford* adopted the reasoning of the district court and found that both elements of the McCarran Act exemption were present. Because the activities in question were found not to be in the nature of boycott, coercion, or intimidation, the action was dismissed for failure to state a claim.

*Crawford* was decided under the Alabama Insurance Code. Both the Alabama and Florida Insurance Codes were patterned after the Model Act. They are therefore quite similar. The court found that Alabama had a general unfair trade practices statute that prohibited all unfair methods of competition· in the conduct of the insurance industry. This general provision granted specific administrative and supervisory powers to the Insurance Commissioner for the enforcement of the prohibition. The same is true of Florida law. *See Fla.Stat.* §§ 626.952 *et seq.*

The *Crawford* court noted U.S. Supreme Court cases finding the broad prohibitions of state "little F.T.C." laws to satisfy the McCarran Act requirement of regulated by state law. *Crawford, supra,* at 219 (citing *F.T.C. v. Brown Shoe,* 384 U.S. 316, 86 S.Ct. 1501, 16 L.Ed.2d 587 (1966); *F.T.C. v. Cement Institute,* 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010 (1948)). The Supreme Court had previously held that violations of the Sherman Act are also unfair trade practices. *See F.T.C. v. Beech-Nut Packing Co.,* 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307 (1921); *Union Circulation Co. v. F.T.C.,* 241 F.2d 652 (2d Cir.1957).

Based upon the foregoing, the court concluded that "when state legislation generally proscribes, permits or otherwise regulates the conduct in question and authorizes enforcement through a scheme of administrative supervision, the McCarran Act requirement of being regulated by state law has been satisfied. Of course, beyond the facts of the *Crawford* case, this statement is dictum.

■ In general, statutory exceptions to the Sherman Act are to be strictly construed. *See Royal Drug Co. v. Group Life & Health Insurance Co., supra; Abbott Labs v. Portland Retail Druggists Association, Inc.,* 425 U.S. 1, 96 S.Ct. 1305, 47 L.Ed.2d 537 (1976); *F.M.C. v. Seatrain Lines, Inc.,* 411 U.S. 726, 93 S.Ct. 1773, 36 L.Ed.2d 620 (1973).

Judge Godbold makes a compelling dissent to the per curiam opinion in *Crawford.* Moreover, the principle espoused in the per curiam opinion has been criticized by other judges and by commentators. *See Owens v. Aetna Life & Casualty Co.,* 654 F.2d 218 (3d Cir.1981) (Sloviter J., dissenting); Sullivan G. Wiley, *Recent Anti-trust Developments: Defining the Scope of Exemptions, Expanding Coverage, and Refining the Rule of Reason,* 27 U.C.L.A.L.REV. 288–291 (1979); Carlson, *The Insurance Exemption from the Antitrust Laws,* 57 Tex.L.Rev. 1127, 1150–1161 (1979).

In his detailed dissent, Judge Godbold reviews the legislative history of the McCarran Act, noting that the regulation of rate setting was at the heart of the purpose of the Act. In *Crawford,* the Act was found to provide immunity for price fixing charges. Price fixing is, of course, clearly within the ambit of state control.

The portions of the Congressional debate that the Judge quotes in his opinion make it equally clear that *the Act was never intended to preempt federal antitrust laws in the face of superficial, ineffective state regulation.*

Mr. Barkley: I should like to ask, in this connection, whether, where states attempt to occupy the field—but do it inadequately—by going through the form of legislation so as to deprive the Clayton Act, the Sherman Act, and the other acts of their jurisdiction, it is the Senator's interpretation of the conference report that in a case of that kind, where the legislature fails adequately even to deal with the field it attempts to cover, these acts still would apply?

Mr. McCarran: That is my interpretation.

*Id.* at 235–236.

Moreover, when Franklin D. Roosevelt signed the bill into law, he reiterated this same premise that the effectiveness of the state regulation would be an element of the inquiry regarding the application of the McCarran immunity. *Id.* at 222 (citing Donovan, Regulation of Insurance Under the McCarran Act, *L. and Contemp. Prob.* 473, 478 & note 25). Indeed the Supreme Court has acknowledged this element of the test in an early McCarran Act decision with the statement that "Petitioner does not argue that the statutory provisions here under review were mere pretense." *See F.T.C. v. National Casualty Co.,* 357 U.S. 560, 78 S.Ct. 1260, 2 L.Ed.2d 1540 (1958). This statement strongly suggests that some sort of inquiry into the adequacy of the state regulation is appropriate.

The Act itself states that it is to apply only "*to the extent* that such business is not regulated by State law." 15 U.S.C. § 1012(b) (emphasis added).

This Court is also concerned with the fact that the Florida Insurance Code and "little F.T.C." could be deemed preemptive and yet do not provide for a private right of action—as is clearly the present intent of Congress in regard to the federal antitrust laws.

### D. *Noerr-Pennington Doctrine*

This Court agrees that the applicability of the Noerr-Pennington doctrine to the acts alleged by the Plaintiff is, as the Court stated in the earlier order of dismissal, a mixed question of law and fact, unsuitable for resolution on a motion to dismiss.

■ The result of this reexamination of the law regarding the scope of the immunity provided by the McCarran Act is the conclusion that it is essential to conduct some sort of inquiry into the adequacy and effectiveness of the state legislation asserted to preempt the antitrust laws. This inquiry, of course, involves factual determinations. The effect of this conclusion, and the others expressed in this opinion, is to require the reinstatement of the monopoly count, Count II, of the complaint. This Court holds that the Plaintiff alleged sufficient facts to state a cause of action for monopoly that is not exempt from the Sherman Act under the McCarran-Ferguson Act or the Noerr-Pennington doctrine.

ORDERED AND ADJUDGED that the motion to reinstate the monopoly count is GRANTED, and said count be and the same is reinstated.