652 So.2d 562 (1995)
FIRST ADVANTAGE INSURANCE, INC. and First National Bank of Denham Springs
v.
The Honorable Douglas D. GREEN, Commissioner of Insurance, State of Louisiana.
No. 94 CA 0813.
Court of Appeal of Louisiana, First Circuit.
March 3, 1995.
Writ Denied May 5, 1995.
*564 A.S. Easterly, III, Denham Springs, for appellants First Advantage Ins., Inc. and First Nat. Bank of Denham Springs.
W. Shelby McKenzie, Baton Rouge, for intervenors-appellees, LA Ass'n of Life Underwriters, Professional Ins. Agents of LA, and Independent Ins. Agents of LA.
Julie A. Fusilier, Baton Rouge, for defendant-appellee, Com'r of Ins.
Mary E. Arceneaux, Baton Rouge, for amicus curiae party, LA Bankers Ass'n.
John J. Gill, Washington, DC, for amicus curiae party, Am. Bankers Ass'n.
Before LOTTINGER, C.J., and SHORTESS and CARTER, JJ.
CARTER, Judge.
This is an appeal from a trial court judgment on a petition for review, affirming an administrative ruling revoking the license of First Advantage Insurance, Inc. (First Advantage) to act as a general insurance agent.

BACKGROUND
The following facts were stipulated to by the parties:
1. First Denham Bancshares, Inc. is a federally regulated bank holding company subject to the authority of the Board of Governors of the Federal Reserve System.
2. First National Bank of Denham Springs is a national banking association holding Charter Number 15344, issued by the Comptroller of the Currency, Treasury Department of the United States.
3. First National Bank of Denham Springs is a wholly-owned subsidiary of First Denham Bancshares, Inc.
4. First Advantage Insurance, Inc. is a wholly-owned, non-banking subsidiary of First National Bank of Denham Springs.
5. By letter dated February 27, 1989, First National Bank of Denham Springs sought the Comptroller's approval to "establish an operating subsidiary, to engage in general de novo insurance activities in communities in which the bank has full service branches and a population of which is less than 5,000 inhabitants."
6. By letter dated March 22, 1989, the Office of the Comptroller of the Currency ("OCC") approved the establishment of First Advantage Insurance, Inc. by First National Bank of Denham Springs. The OCC letter stated, inter alia, that First Advantage Insurance, Inc. could "sell insurance *565 as agent to existing and potential customers regardless of where the customers are located."
7. First Advantage Insurance, Inc. is a Louisiana corporation in good standing.
8. First Advantage Insurance, Inc. holds license number 181589 from the Commissioner of Insurance, State of Louisiana.
9. First National Bank of Denham Springs has its principal offices in the City of Denham Springs and has branches in the City of Denham Springs, Springfield, Walker, French Settlement, Albany, and Watson, Louisiana. Only the City of Denham Springs has a population in excess of 5,000 inhabitants.
10. First Advantage Insurance, Inc. is not presently marketing or selling insurance as agent due to the pendency of this administrative proceeding.
11. First National Bank of Denham Springs through First Advantage Insurance, Inc. plans to pursue all insurance agent powers that they believe to be lawful.
12. Robert Alton Seals, Jr. has been a licensed insurance agent for approximately thirteen (13) years and is Vice President and Manager of First Advantage Insurance, Inc. During all of the time that Mr. Seals has been affiliated with First Advantage, he has also been Assistant Vice President and Trust Officer of the First National Bank of Denham Springs.
13. The Louisiana Association of Life Underwriters is a non-profit association representing life insurance agents and is a member of the National Association of Life Underwriters. The Independent Insurance Agents of Louisiana, Inc., is a member of the Independent Insurance Agents of America, Inc. and is a non-profit association representing insurance agents who primarily sell property and casualty insurance, but whose members also sell life insurance and annuities. The Professional Insurance Agents of Louisiana, Inc. is an affiliate of National Association of Professional Insurance Agents, Inc. and is a nonprofit association representing insurance agents who primarily sell property and casualty insurance, but whose members also sell life insurance and annuities.
14. By letter dated May 24, 1988, First Denham Bancshares, Inc. sought approval of the Board of Governors of the Federal Reserve System to engage in general insurance agency activities in two Louisiana towns, each with a population of fewer than 5,000 residents, according to the 1980 census.
15. By letter dated November 21, 1988, the Independent Insurance Agents of America, Inc. et al, notified the Board of Governors of the Federal Reserve System of no objection to the application of First Denham Bancshares, Inc. subject to the small town exemption provided by law, 12 USC Section 1843(c)(8)(C)(i) and so long as the geographic limitations that the Board has applied pursuant to that provision were complied with by the applicant.
16. William D. Waldrep, Sara G. Daniel, Michael Atkinson, James F. Patrick and Roy Morgan, all employees of First National Bank of Denham Springs, are licensed by the Commissioner of Insurance, State of Louisiana, to act as life, health and accident insurance agents, in addition to Robert A. Seals, Jr.
17. First National Bank of Denham Springs is only engaged and will only be engaged in the sale of credit related insurance as described in La.R.S. 6:242 A.(6).
18. First Advantage plans to open its office in Walker, Louisiana, and sell insurance from this office. First Advantage may open offices later in Watson, Springfield, French Settlement and/or Albany and sell insurance therefrom.
19. First Advantage may market its insurance products through the following methods: (1) direct mail, with or without geographic limitation, to potential customers, including present customers of First National Bank of Denham Springs; (2) radio advertising through stations whose coverage area is shown on Exhibits 9, 10 and 11, as well as other stations whose coverage area includes Livingston Parish; (3) cable television systems that transmit to and within Livingston Parish or parts thereof, including Denham Springs; and (4) newspaper advertising through the Denham Springs News, which is published in Denham *566 Springs, Louisiana. The inclusion of these possible marketing methods herein is not intended nor shall it be construed to be an agreement that such is either legally permissible or believed to be legally permissible.
20. The positions of the Comptroller of the Currency and the Office of Financial Institutions are contained within Exhibits 12 and 13 without any agreement between the parties as to the correctness thereof.
21. The present officers of First Advantage are: Robert E. Easterly, President; Ruben Spillman, Sr., Secretary; Oscar P. Waldrep, Jr., Treasurer; and Robert Seals, Jr., Senior Vice President and Manager. R. Dawes Easterly, Ruben Spillman, Sr. and Oscar P. Waldrep, Jr. are the directors of First Advantage. The directors of First Advantage and Robert E. Easterly are also directors of First National Bank of Denham Springs and First Denham Bancshares, Inc., both of which corporations has the same nine (9) directors. R. Dawes Easterly is Chairman and Chief Executive Officer of First Denham Bancshares, Inc., and Robert E. Easterly is President of First Denham Bancshares, Inc. and President and Chief Executive Officer of First National Bank of Denham Springs.
22. First Advantage was the agent of record for the group life insurance policy on employees of First National Bank of Denham Springs from June 1, 1990 through August 1, 1990. First Advantage was the agent of record for the group health and accident insurance policy of First National Bank of Denham Springs from July 1, 1990 through August 31, 1990. Due to the pendency of this proceeding, First National Bank of Denham Springs changed it agent of record for each policy of insurance described herein effective September 1, 1990.
The parties make no contention that First Advantage is ineligible to act as an insurance agent due to non-activity pending resolution of this matter nor that First Advantage was created solely to write insurance coverage for which its employees are beneficiaries.

FACTS
On or about August 2, 1990, First National Bank of Denham Springs (First National) and First Advantage received notice of a hearing from the Commissioner of Insurance (Commissioner). In the notice, the Commissioner ordered First National and First Advantage to show cause why the insurance agent license of First Advantage should not be revoked. The Commissioner alleged that First Advantage was violating LSA-R.S. 22:1214(12)[1] and 22:1121[2] and specifically the Louisiana Insurance Unfair Trade Practices Act by acting as an agent in violation of the state banking laws, in particular LSA-R.S. 6:121B(2), 6:242A(6), and 6:513.
After a hearing, the hearing officer incorporated the joint stipulation of facts into his ruling and determined that, although the National Bank Act and the Bank Holding Company Act permit national banks and subsidiaries of national banks to sell insurance in towns with a population of less than 5,000 inhabitants, such authority is subject to state regulation. Because state law, specifically LSA-R.S. 6:121B, prohibits any bank,[3] bank holding company, or subsidiary to engage in any insurance activity except as specifically provided in LSA-R.S. 6:242A(6), the only insurance activity in which a bank may engage is the sale of credit life and credit health and accident insurance to its customers. Accordingly, the hearing officer determined that the insurance agent license of First Advantage was limited in accordance with the provisions of the ruling, either by amendment or the issuance of a new license, *567 and First Advantage's license to act as a full life agent was revoked.
On January 16, 1991, First Advantage and First National filed a petition for judicial review, seeking a reversal of the Commissioner's order and a reinstatement of First Advantage's license. On November 3, 1993, the Louisiana Association of Life Underwriters (LALU), the Professional Insurance Agents of Louisiana (PIAL), and the Independent Insurance Agents of Louisiana (IIAL) filed a petition of intervention. The Louisiana Bankers Association filed an amicus curiae brief in support of the request for review of the administrative determination revoking First Advantage's general insurance agent license to sell life, health, and accident insurance.
After a hearing, the trial court rendered judgment, affirming the decision of the hearing officer and dismissing First National's and First Advantage's petition for review at their costs. The judgment was signed on December 21, 1993.
From this adverse judgment, First Advantage and First National appeal, assigning the following errors:[4]
1. The trial court committed clear error in its decision, reflecting a total misunderstanding of appellants' argument and thus the decision below is entitled to no weight on review.
2. The trial court applied an erroneous test for preemption and erred as a matter of law.
3. The court erred in holding First Advantage's insurance powers are prohibited as an indirect subsidiary of a bank holding company.
4. The lower court denied equal protection of the law to plaintiffs-appellants.

PREEMPTION
The preemption doctrine has its roots in the Supremacy Clause, U.S. Const. Art. VI, cl. 2. It is well settled that the Supremacy Clause of the United States Constitution (Article VI, clause 2) invalidates state laws that "interfere with, or are contrary to" federal law. See Hillsborough County, Florida v. Automated Medical Laboratories, Inc., 471 U.S. 707, 712, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985); Maryland v. Louisiana, 451 U.S. 725, 746, 101 S.Ct. 2114, 2129, 68 L.Ed.2d 576 (1981). Basic to this constitutional command is the notion that all state provisions which conflict with federal law are without effect. See Maryland v. Louisiana, 451 U.S. at 747, 101 S.Ct. at 2129, 68 L.Ed.2d 576.
Preemption may be either express or implied and is compelled whether Congress's command is explicitly stated in the statute's language or implicitly contained in its structure and purpose. Fidelity Federal Savings and Loan Association v. de la Cuesta, 458 U.S. 141, 152-53, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982); Jones v. Rath Packing Company, 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977); Massachusetts Medical Society v. Dukakis, 815 F.2d 790, 791 (1st Cir.1987), cert. denied, 484 U.S. 896, 108 S.Ct. 229, 98 L.Ed.2d 188 (1987). Consideration under the Supremacy Clause begins with the basic assumption that Congress did not intend to displace state law. But, as the Supreme Court pointed out in Rice v. Santa Fe Elevator Corporation, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947):
Such a purpose [to displace state law] may be evidenced in several ways. The scheme of federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it. Or the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject. Likewise, the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose. Or the state policy may produce a result inconsistent with the objective of the federal statute. (citations omitted).
*568 Hillsborough County, Florida v. Automated Medical Laboratories, Inc., 471 U.S. at 713, 105 S.Ct. at 2375, 85 L.Ed.2d 714. A state statute is also void to the extent it conflicts with federal lawif, for example, "compliance with both federal and state regulations is a physical impossibility," Hillsborough County, Florida v. Automated Medical Laboratories, Inc., 471 U.S. at 713, 105 S.Ct. at 2375, 85 L.Ed.2d 714; Florida Lime and Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-43, 83 S.Ct. 1210, 1217-18, 10 L.Ed.2d 248 (1963), or where the law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Hillsborough County, Florida v. Automated Medical Laboratories, Inc., 471 U.S. at 713, 105 S.Ct. at 2375, 85 L.Ed.2d 714; Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). See Maryland v. Louisiana, 451 U.S. at 747, 101 S.Ct. at 2129, 68 L.Ed.2d 576.
In the instant case, the Louisiana statutes and federal statute at issue are LSA-R.S. 6:121B(2), 6:242A(6), and 6:513 and 12 U.S.C. § 92, respectively.
LSA-R.S. 6:121B(2)[5] provides as follows:
Notwithstanding any other provision of this Title, the commissioner shall not authorize any bank, bank holding company, or subsidiary thereof to engage in any insurance activity except an insurance activity in which a bank may engage pursuant to the provisions of R.S. 6:242(A)(6). However, any bank which was engaged as a general insurance agent or broker on January 1, 1984, may continue to be so engaged. (emphasis added.)
LSA-R.S. 6:242A(6)[6] provides as follows:
*569 A. In addition to the general corporate powers conferred in R.S. 6:241 and the powers conferred by other provisions of the laws of this state, a state bank shall have the following banking powers and those incidental to the exercise of these powers:
(6) To act as the agent for any insurance company authorized to do insurance business in this state by soliciting and selling insurance, but only with respect to credit insurance which, within the terms and conditions authorized by law, is limited to assuring repayment or partial repayment of the outstanding balance due on a specific extension of credit by a bank in the event of the death, disability, or involuntary unemployment of the debtor and collecting premiums on those policies issued through the bank by such insurance company; and to receive for services so rendered such commissions or fees as may be agreed upon between the bank and the insurance company for which it is acting as agent. Notwithstanding any other provisions of this Title, no bank shall engage or be authorized to engage in any insurance activity that is not expressly permitted by this Subsection (A)(6). Nothing contained in this Subsection or in any other Section or Subsection of this Title shall prohibit any bank which was engaged as a general insurance agent or broker on January 1, 1984, from continuing to be so engaged. (emphasis added.)
LSA-R.S. 6:513[7] provides that it is unlawful:
(1) Until July 1, 1989, for any bank holding company or subsidiary thereof to open for business any bank not now opened for business whether or not a charter, permit, license, or certificate to open for business has already been issued.
(2) For any company to become a bank holding company unless the primary purpose of the corporation is the ownership or control of one or more banks.
(3) For any bank holding company or subsidiary thereof to engage in any such insurance activity except an insurance activity in which a bank may engage. (emphasis added.)
12 U.S.C. § 92[8] provides as follows:

*570 In addition to the powers now vested by law in national banking associations organized under the laws of the United States any such association located and doing business in any place the population of which does not exceed five thousand inhabitants, as shown by the last preceding decennial census, may, under such rules and regulations as may be prescribed by the Comptroller of the Currency, act as the agent for any fire, life, or other insurance company authorized by the authorities of the State in which said bank is located to do business in said State, by soliciting and selling insurance and collecting premiums on policies issued by such company; and may receive for services so rendered such fees or commissions as may be agreed upon between the said association and the insurance company for which it may act as agent: Provided, however, That no such bank shall in any case assume or guarantee the payment of any premium on insurance policies issued through its agency by its principal: And provided further, That the bank shall not guarantee the truth of any statement made by an assured in filing his application for insurance. (emphasis added.)
A cursory reading of these statutes reveals that 12 U.S.C. § 92 permits national banks located in places where the population does not exceed five thousand inhabitants to "act as agent for any fire, life, or other insurance company authorized by the authorities of the State in which said bank is located to do business in said State." However, the provisions of Title 6 under Louisiana law, specifically LSA-R.S. 6:121B(2), 6:242A(6), and 6:513, limit the ability of banks and bank holding companies to engage in any insurance activity, except those activities involving credit life and credit health and accident insurance.
Therefore, because Section 92 authorizes national banks to sell all types of insurance in towns of less than 5,000 inhabitants and the laws of the State of Louisiana limit the ability of all banks, including national banks, to engage in any insurance activity, except credit-related insurance, we conclude that, under a conventional preemption analysis, 12 U.S.C. § 92 may preempt LSA-R.S. 6:121B(2), 6:242A(6), and 6:513. However, our inquiry does not end here.

A. McCarran-Ferguson
We must next determine whether the McCarran-Ferguson Act "immunizes" or "saves" LSA-R.S. 6:121B(2), 6:242A(6), and 6:513 from preemption by 12 U.S.C. § 92. The relevant portion of the McCarran-Ferguson Act states that:
No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, ... unless such Act specifically relates to the business of insurance.
15 U.S.C. § 1012(b).
The McCarran-Ferguson Act was passed by Congress in 1945 in response to the United States Supreme Court's decision in United States v. South-Eastern Underwriters Association, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944). Prior to that decision, pursuant to Paul v. Commonwealth of Virginia, 75 U.S. 168, 183, 19 L.Ed. 357, 8 Wall. 168 (1868), issuing a policy of insurance was not a transaction of commerce, and, as such, was not subject to federal regulation. In United States v. South-Eastern Underwriters Association, 322 U.S. at 539, 64 S.Ct. at 1166, 88 L.Ed. 1440, the United States Supreme Court noted that the "modern insurance business holds a commanding position in the trade and commerce of our Nation," and held for the first time that insurance activities conducted across state lines were subject to regulatory power of Congress under the Commerce Clause and the antitrust laws, in particular. By subsequently enacting the McCarran-Ferguson Act, Congress attempted to turn back the clock to assure that the activities of insurance companies in dealing with their policy holders would remain under state regulation. In *571 other words, McCarran-Ferguson "restore[d] the supremacy of the States in the realm of insurance regulation." United States Department of Treasury v. Fabe, ___ U.S. ___, ___, 113 S.Ct. 2202, 2207, 124 L.Ed.2d 449 (1993).
The McCarran-Ferguson Act protects Louisiana state law[9] from preemption by federal law,[10] if two factors are satisfied. First, the state statutes, LSA-R.S. 6:121B(2), 6:242A(6), and 6:513, must have been enacted "for the purpose of regulating the business of insurance." 15 U.S.C. § 1012(b). Second, the federal statute, 12 U.S.C. § 92, must not "specifically relate to the business of insurance." 15 U.S.C. § 1012(b).

B. Fabe and the Application of 15 U.S.C. § 1012(b).
The analysis for determining whether LSA-R.S. 6:121B(2), 6:242A(6), and 6:513 were enacted for the purpose of regulating the business of insurance is controlled by United States Department of Treasury v. Fabe, ___ U.S. at ___, 113 S.Ct. at 2207, 124 L.Ed.2d 449. In Fabe, the United States Supreme Court held that an Ohio statute was saved from federal preemption to the extent that it regulated the relationship between the insurance company and its policy holders. United States Department of Treasury v. Fabe, ___ U.S. at ___, 113 S.Ct. at 2208, 124 L.Ed.2d 449. In its analysis, the United States Supreme Court distinguished the first and second clauses of 15 U.S.C. § 1012(b). The first clause, "enacted by any state for the Purpose of regulating the business of insurance," deals with those state laws enacted for the purpose of regulating insurance and saves applicable state laws from federal preemption. The second clause, on the other hand, exempts from preemption only "the business of insurance" itself from the antitrust laws. United States Department of Treasury v. Fabe, ___ U.S. at ___, 113 S.Ct. at 2209, 124 L.Ed.2d 449. Citing Black's Law Dictionary 1236, 1238 (6th ed. 1990), the United States Supreme Court noted that the broad category of laws enacted "for the purpose of regulating the business of insurance" consists of laws that possess the "end, intention, or aim" of adjusting, managing, or controlling the business of insurance. United States Department of Treasury v. Fabe, ___ U.S. at ___, 113 S.Ct. at 2210, 124 L.Ed.2d 449. The United States Supreme Court then explained that this category necessarily encompassed more than just "the business of insurance." Thus, the Supreme Court explicitly distinguished the first clause of 15 U.S.C. § 1012(b) from the second clause, making it clear that the first clause "is not so narrowly circumscribed" as the second clause. United States Department of Treasury v. Fabe, ___ U.S. at ___, _ ___, 113 S.Ct. at 2209-10, 124 L.Ed.2d 449.
Moreover, in Fabe, the United States Supreme Court disputed the allegation that it was violating a basic rule of statutory construction "that identical words used in different parts of the same act are intended to have the same meaning," namely that the term "business of insurance" as used in the first and second clauses of 15 U.S.C. § 1012(b) should be ascribed the same meaning. United States Department of Treasury v. Fabe, ___ U.S. at ___ n. 6, 113 S.Ct. at 2210 n. 6, 124 L.Ed.2d 449. The United States Supreme Court acknowledged that "[t]his argument might be plausible if the two clauses actually employed identical language," but the first clause of 15 U.S.C. § 1012(b) uses the term "purpose," which is significantly absent from the second clause. United States Department of Treasury v. Fabe, ___ U.S. at ___ n. 6, 113 S.Ct. at 2210 n. 6, 124 L.Ed.2d 449. However, the failure to distinguish the first clause from the second overlooks another maxim of statutory construction, namely "that a court should `give effect, if possible, to every clause and word of a statute.'" U.S. Department of Treasury v. Fabe, ___ U.S. at ___ n. 6, 113 S.Ct. at 2210 n. 6, 124 L.Ed.2d 449.
Therefore, in applying the analysis as set forth in Fabe, we must examine the specific provisions of the Louisiana state statutes, *572 namely LSA-R.S. 6:121B(2), 6:242A(6), and 6:513, to determine whether those state statutes were enacted for the purpose of regulating the business of insurance.

1. Were LSA-R.S. 6:121B(2), 6:242A(6), and 6:513, enacted for the purpose of regulating the business of insurance?
In Securities and Exchange Commission v. National Securities, Inc., 393 U.S. 453, 460, 89 S.Ct. 564, 568-69, 21 L.Ed.2d 668 (1969), the United States Supreme Court noted that the first clause of Section 2(b) of McCarran-Ferguson, i.e. "for the purpose of regulating the business of insurance," was aimed at:
The relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcementthese were the core of the "business of insurance." Undoubtedly, other activities of insurance companies relate so closely to their status as reliable insurers that they must be placed in the same class. But whatever the exact scope of the statutory term, it is clear where the focus wasit was on the relationship between the insurance company and the policyholder. Statutes aimed at protecting or regulating this relationship, directly or indirectly are laws regulating the "business of insurance."
393 U.S. at 460, 89 S.Ct. at 568-69, 21 L.Ed.2d 668.
In the instant case, LSA-R.S. 6:121B(2), 6:242A(6), and 6:513 seek to limit or restrict a bank or bank holding company from engaging in any insurance activity not specifically authorized by state statute. The only authorized insurance activity in which a bank, and therefore a bank holding company, may engage is the sale of credit-related insurance. These state statutory provisions were enacted by the state legislature to protect and regulate the relationship between insurer and insured at a very basic level by barring a certain industry, namely the banking industry, from selling all types of insurance. The legislature was apparently concerned that, if banks were licensed to sell all types of insurance, including fire, life, automobile, homeowners, etc., then consumers may feel coerced into purchasing insurance from the bank in order to obtain a loan regardless of the cost of the premium for such insurance. However, the state legislature permitted the banking industry to sell those credit-related insurances which assure repayment of the banks' outstanding loans to its customers. The state statutory provisions limiting the authority of banks to engage in general insurance sales were enacted out of concern for future policy holders and a desire by the legislature to protect the insurance relationship between insurers and insureds.
Clearly, the relationship between insurer and insured, the authority of an individual or entity to sell a certain type of insurance policy, and other activities of individuals or entities acting in the capacity of insurance companies relate so closely to their status as reliable insurers that they must be placed in the same class as the types of activities that are at the core of the "business of insurance." Regardless of the scope of the statutory provisions and their placement in the Banking Code, it is clear that the focus of the Louisiana state statutes, namely LSA-R.S. 6:121B(2), 6:242A(6), and 6:513, was on the relationship between the insurance company and the policy holder. Statutes aimed at protecting or regulating this relationship, directly or indirectly, are laws regulating the business of insurance.
Moreover, although LSA-R.S. 6:121B(2), 6:242A(6), and 6:513 are not located in the state Insurance Code and are located in the state Banking Code, the placement of a statute is not a controlling determinant as to its purpose. As the United States Supreme Court noted in United States Department of Treasury v. Fabe, ___ U.S. at ___, 113 S.Ct. at 2210, 124 L.Ed.2d 449, quoting Securities and Exchange Commission v. National Securities, Inc., 393 U.S. at 460, 89 S.Ct. at 569, "mere matters of form need not detain us." It is sufficient that the state legislature undertook to regulate insurance generally for specific statutes to fall within the meaning of McCarran-Ferguson. The McCarran-Ferguson Act's "state regulation" requirement is satisfied by the general undertaking by a state to regulate the insurance industry. See *573 Federal Trade Commission v. National Casualty Company, 357 U.S. 560, 564, 78 S.Ct. 1260, 1262, 2 L.Ed.2d 1540 (1958).
Based on the above, we find that LSA-R.S. 6:121B(2), 6:242A(6), and 6:513 were clearly enacted to regulate the business of insurance. We must next determine whether the federal statute, 12 U.S.C. § 92, specifically relates to the business of insurance.

2. Does the federal statute, 12 U.S.C. § 92, "specifically relate to the business of insurance."
The legislative history of Section 92 reveals that the provision was enacted to strengthen small national banks by providing them with an additional source of revenue. Owensboro National Bank v. Moore, 803 F.Supp. 24, 34-35 (E.D.Ky.1992). However, the granting of power to national banks which involves insurance does not transform this section into a regulation of the business of insurance. Owensboro National Bank v. Moore, 803 F.Supp. at 36. Moreover, although the United States Supreme Court has not been explicit on how specific a federal statute must be to preempt a state law which regulates the business of insurance, in United States Department of Treasury v. Fabe, ___ U.S. at ___, 113 S.Ct. at 2211, 124 L.Ed.2d 449, the United States Supreme Court determined that McCarran-Ferguson calls for a "clear-statement rule." According to this rule, a federal statute, such as 12 U.S.C. § 92, must "clearly state" that it regulates the business of insurance or otherwise intends to preempt a contrary state law. United States Department of Treasury v. Fabe, ___ U.S. at ___, 113 S.Ct. at 2211, 124 L.Ed.2d 449. This scheme creates a reversepreemption doctrine for insurance regulation in that a state statute that regulates insurance presumptively preempts a contrary Congressional statute unless the Congressional statute specifically relates to the business of insurance. Barnett Bank of Marion County, N.A. v. Gallagher, 43 F.3d 631 (11th Cir. (Fla.)), decided 1/30/95.
Examining the language of 12 U.S.C. § 92, we find that there is nothing in the language to indicate that it regulates the business of insurance. Section 92 is silent as to its effect on state insurance law. There is no language contained therein which expresses congressional intent that it preempts state insurance laws to the contrary. Congress did not expressly state that it intended to preempt the states' traditional power to prohibit insurance activities in their small towns. Instead, Congress merely stated that, in addition to their "shall" powers, national banks "may" act as insurance agents in small towns. The use of the more lenient word "may" in Section 92 supports the notion that Congress did not intend that national banks necessarily be able to sell insurance in small towns. Moreover, Section 92 does not expressly state that it relates to the business of insurance. Other than the provision that national banks may act as insurance agents in small towns, there is no other language in Section 92 dealing with insurance or the regulation thereof. Further, the context of Section 92 has always been within the regulation of banking rather than the regulation of insurance. As such, we find that Section 92 does not specifically relate to the business of insurance.
In enacting other types of legislation involving insurance and/or the regulation thereof, Congress has been quite explicit, although not always clear, on its intent to preempt contrary state law. In ERISA, for example, Congress clearly set forth its preemptive intent and therefore the preemptive effect of the federal statute. ERISA, unlike Section 92, expressly directs that the statute "shall supersede any and all State laws insofar as they may now or hereafter relate to any employment benefit plan." 29 U.S.C. § 1144(a). In John Hancock Mutual Life Insurance Co. v. Harris Trust & Savings Bank, ___ U.S. ___, ___, 114 S.Ct. 517, 526, 126 L.Ed.2d 524 (1993), the United States Supreme Court applied traditional principles to interpret the scope of the ERISA preemption provisions, but only after it was clear, under the McCarran analysis, that Congress intended to preempt state law.
Certainly, in enacting Section 92, if Congress had intended to regulate the business of insurance and preempt state laws, Congress could have included language to that *574 effect. For example, Congress could have stated that national banks may act as insurance agents in small towns without compliance with state insurance laws. However, Congress did not include such a provision. Instead, in enacting Section 92, Congress stated that national banks "may, under such rules and regulations as may be prescribed by the Comptroller of the Currency, act as the agent for any fire, life, or other insurance company authorized by the authorities of the State in which said bank is located to do business in said State." (emphasis added.) This language manifests Congressional intent that such small town national banks, which chose to act as general insurance agents, do so as authorized by the state laws in which the banks were located. Clearly, this language manifests a contrary intent by Congress, namely, that national banks must comply with the insurance laws of the state in which they operate.
Under federal law, national banks in Louisiana have the capability to sell insurance from locations in small towns; however, this right is not unfettered. The State of Louisiana can still oversee the sales of insurance through reasonable licensing requirements applicable to all entities acting as agents for the sale of insurance in Louisiana. In Louisiana, state laws regulating insurance prohibit banks, both state and national, to act as agents for the sale of all types of insurance, except credit-related insurance.
Because 12 U.S.C. § 92 does not specifically relate to the business of insurance, state laws, namely LSA-R.S. 6:121B(2), 6:242A(6), and 6:513, enacted for the purpose of regulating the business of insurance do not yield to the federal statute. Further, there is no "clear statement" that 12 U.S.C. § 92 intends to regulate the business of insurance or otherwise intends to preempt state law. Therefore, we find that the McCarran-Ferguson Act saves LSA-R.S. 6:121B(2), 6:242A(6), and 6:513 from preemption by 12 U.S.C. § 92.

C. Conflict in Federal Courts.
At the time the parties filed their initial briefs, two United States district courts had addressed similar federal preemption issues involving state insurance provisions, from which appeals were taken. See Barnett Banks of Marion County, N.A. v. Gallagher, 839 F.Supp. 835 (M.D.Fla.1993), and Owensboro National Bank v. Moore, 803 F.Supp. at 24. Since the docketing of the instant appeal, two United States Courts of Appeal have rendered decisions on those appeals. The Sixth Circuit Court of Appeal has rendered a decision in Owensboro National Bank v. Stephens, 44 F.3d 388 (6th Cir. (Ky.)), decided 12/29/94, and the Eleventh Circuit Court of Appeal has rendered a decision in Barnett Bank of Marion County, N.A. v. Gallagher, 43 F.3d 631 (11th Cir. (Fla.)), decided 1/30/95.

1. Owensboro National Bank v. Stephens.
In Owensboro the U.S. appellate court for the Sixth Circuit, in a split decision, addressed whether a Kentucky state statute, which sought to restrict banks from acting as insurance agents for any insurance other than credit-related insurance, was preempted by Section 92.[11] The court concluded that, under a conventional preemption analysis, the Kentucky state statute was preempted by Section 92, which allows national banks in towns of fewer than 5,000 persons to act as insurance agents.
In determining whether McCarran-Ferguson immunizes the Kentucky state statute from preemption by Section 92, the court in Owensboro considered whether the Kentucky state statute had been enacted for the purpose of regulating the business of insurance. The court noted that the "business of insurance" is made up of "practices" and "activities" that satisfy the criteria set forth in Union Labor Life Insurance Company v. Pireno, 458 U.S. 119, 120, 102 S.Ct. 3002, *575 3004, 73 L.Ed.2d 647 (1982). Under Pireno, the criteria are:
[F]irst, whether the practice has the effect of transferring or spreading a policyholder's risk; second, whether the practice is an integral part of the policy relationship between the insurer and the insured; and third, whether the practice is limited to entities within the insurance industry.
458 U.S. at 120, 102 S.Ct. at 3004, 73 L.Ed.2d 647.
The majority determined that the Kentucky state statute does not possess the requisite aim of regulating activities that meet the Pireno criteria. The court noted that the Kentucky state statute defined the powers of Kentucky bank holding companies by excluding such companies from participating in activities that constitute the business of insurance. The majority reasoned that excluding a person or entity from participation in an activity is different from regulating the manner in which the activity is conducted. The former is the regulation of the person; the latter is the regulation of the activity. The court in Owensboro then concluded that the Kentucky state statute regulated only persons or entities owning more than one-half of the capital stock of a bank and in no way governed the manner in which the activities constituting the "business of insurance" are conducted.[12] As such, the majority in Owensboro found that McCarran-Ferguson did not save the Kentucky state statute from preemption by Section 92.
In a dissenting opinion in Owensboro, Judge Alice M. Batchelder opined that the Kentucky state statute was shielded from preemption by Section 92 by the McCarran-Ferguson Act. The dissent found that both factors of the McCarran-Ferguson Act were satisfied in that the Kentucky state statute was enacted for the purpose of regulating the business of insurance and that Section 92 does not specifically relate to the business of insurance. In refusing to apply the Pireno factors, the dissent determined that, although the Pireno criteria are relevant in determining the applicability of the antitrust exemption, they are not determinative with respect to the first clause of 15 U.S.C. § 1012(b).[13]
The dissent further determined that the more recent opinion by the United States Supreme Court in United States Department of Treasury v. Fabe, ___ U.S. at ___, 113 S.Ct. at 2202, 124 L.Ed.2d 449, was applicable. According to the dissent, the United States Supreme Court in Fabe distinguished between the first and second clauses of 15 U.S.C. 1012(b). The first clause of Section 1012(b) deals with state laws enacted for the purpose of regulating the business of insurance and saves applicable state laws from preemption. On the other hand, the second clause exempts from preemption only the business of insurance from the antitrust laws.
In applying the McCarran-Ferguson analysis to the Kentucky state statute, the dissent found that the statute was enacted to regulate the business of insurance. In support of this position, the dissent stated that, if a state aims to protect or regulate the insurer/insured relationship, it is regulating the business of insurance, citing Securities and Exchange Commission v. National Securities, Inc., 393 U.S. at 460, 89 S.Ct. at 568, 21 L.Ed.2d 668. Because the Kentucky state statute sought to regulate the relationship between insurer and insured at its most basic level, namely to limit the involvement of banks in insurance-related activities to prevent the coercion of bank customers into purchasing insurance to obtain loans, the dissent set forth that the Kentucky state legislature enacted the statute out of direct concern for future policy holders. As such, the dissent reasoned that the Kentucky state statute was aimed at the protection of the insurance relationship between insurers and policy *576 holders and regulated the business of insurance.
Moreover, the dissent examined whether Section 92 specifically related to the business of insurance, noting that the United States Supreme Court in Fabe determined that McCarran-Ferguson calls for a "clear statement rule," which means that to be specifically related to the business of insurance, Section 92 must clearly state that it regulates the business of insurance or otherwise intends to preempt a contrary state law. In refusing to find that Section 92 specifically related to the business of insurance, the dissent noted that the context of Section 92 has always been within the regulation of banking rather than insurance and that no party had cited any case in support of the contention that Section 92 specifically related to the business of insurance.
Accordingly, the dissent determined that McCarran-Ferguson prevented federal preemption of the Kentucky state statute.

2. Barnett Bank of Marion County, N.A. v. Gallagher.
More recently, the United States Court of Appeal for the Eleventh Circuit in Barnett Bank of Marion County, N.A. v. Gallagher, 43 F.3d 631 (11th Cir. (Fla.), decided 1/30/95, addressed the issue of whether a Florida state statute, which provided that no insurance agent licensed by the Department of Insurance who is associated with ... a financial institution shall engage in insurance agency activities as an employee, officer, director, agent, or associate of a financial institution agency, must yield to Section 92. In applying the criteria set forth in Fabe, the U.S. appellate court for the Eleventh Circuit examined whether the Florida state law was aimed at the regulation of an essential part of the business of insurance. The court determined that, because of the possible pressure which could be applied on policy holders facilitating improper insurance decisions, the Florida state statute protects policy holders. As such, the Florida state statute regulates the business of insurance under the terms of McCarran-Ferguson, and the federal law must yield to the extent that the state law furthers the interest of policy holders.
The Eleventh Circuit Court of Appeal further opined that state laws enacted for the purpose of regulating the business of insurance do not yield to conflicting federal statutes unless a federal statute specifically requires otherwise. In determining whether Section 92 requires otherwise, the court noted that the legislative history of Section 92 revealed that, prior to 1944, Congress and the United States Supreme Court understood Paul v. Commonwealth of Virginia, 75 U.S. at 183, 19 L.Ed. 357, 8 Wall. 168, to place insurance outside the Commerce Clause. The court reasoned that, at the time Congress enacted Section 92 and for thirty years thereafter, Congress believed it did not have the power to regulate insurance. As such, Congress could not have intended to regulate the business of insurance when it did not believe that it had the power to do so. Hence, in enacting Section 92, Congress was concerned with banking and not insurance. The court then concluded that, since Section 92 neither relates to the business of insurance nor specifically requires that the apparently conflicting state law be preempted, under McCarran-Ferguson, the Florida state statute was not preempted by federal law.
For the reasons set forth previously, we believe the opinion in Barnett Bank by the Eleventh Circuit Court of Appeal and the dissenting opinion in Owensboro by the Sixth Circuit Court of Appeal are the better reasoned and are more persuasive than the majority opinion in Owensboro.

BANK HOLDING COMPANY AND SUBSIDIARY
Pursuant to the stipulation of the parties, First National is a wholly-owned subsidiary of Bancshares, a bank holding company, and First Advantage is a whollyowned subsidiary of First National Bank. LSA-R.S. 6:121B(2) clearly prohibits any bank, bank holding company, or subsidiary thereof to engage in any insurance activity except as expressly authorized in LSA-R.S. 6:242A(6). Moreover, LSA-R.S. 6:513 prohibits a bank holding company or any subsidiary thereof to engage in any insurance activity, except for those activities in which a bank can engage. Because we have *577 determined that First National cannot engage in any insurance activity, except as authorized in LSA-R.S. 6:242A(6), it follows then that First Advantage, its wholly-owned subsidiary, and Bancshares, a bank holding company, cannot engage in any insurance activity except as authorized in LSA-R.S. 6:242A(6). Pursuant to LSA-R.S. 6:242A(6), the only insurance activity in which a bank and, therefore, a bank subsidiary or a bank holding company may engage in is the sale of credit life insurance and credit health and accident insurance to its customers.

DENIAL OF EQUAL PROTECTION
First National and First Advantage contend that the prohibition on bank sales of insurance violates the Equal Protection Clauses of both the federal and state constitutions because savings and loans are permitted to sell insurance in Louisiana. However, First National and First Advantage failed to demonstrate that state and national banks are treated differently. The Louisiana statutory scheme clearly prohibits all banks, both national and state, from engaging in any insurance activity, except for the sale of credit life insurance and credit health and accident insurance to its customers. Moreover, First National and First Advantage failed to demonstrate that the Louisiana statutory scheme with regard to the differential treatment of banks and savings and loans with respect to the sale of insurance is unconstitutional.

CONCLUSION
The issues raised in this appeal are the most recent conflicts in the long running turf battle on the part of two powerful industries, namely banking and insurance, each of which is subject to governmental regulation. The jurisprudence reveals that these battles are occurring in states around the country, and different courts are arriving at different results. Ultimately, the various questions raised will have to be answered by the United States Supreme Court. We strongly feel that we have reached the better reasoned conclusion to the very complicated issues involved in this litigation.
For the above reasons, the judgment of the trial court affirming the revocation of First Advantage's general insurance agent license and limiting such insurance agent license to the sale of credit life and credit health and accident insurance to its customers is affirmed. To the extent that the judgment of the trial court is in conflict with this opinion, it is hereby amended. First Advantage and First National are cast for all costs on appeal.
AFFIRMED, AS AMENDED.
NOTES
[1] LSA-R.S. 22:1214(12) declares that any violation of any prohibitory law of this state is an unfair method of competition and unfair or deceptive act or practice in the business of insurance.
[2] LSA-R.S. 22:1121 relates to the refusal, suspension, or revocation of licenses and to the imposition of fines. By Acts 1993, No. 952, § 2, effective, January 1, 1994, LSA-R.S. 22:1121 was repealed, and the provisions relating to the refusal, suspension, or revocation of licenses and to the imposition of fines are now set forth in LSA-R.S. 22:1114 and 22:1115.
[3] LSA-R.S. 6:2(1) defines a "bank" as "any state bank or any national bank."
[4] Although the opinion does not address each assignment of error individually, the opinion adequately disposes of all of the issues raised.
[5] Acts 1990, No. 611, § 1, effective July 19, 1990, amended and reenacted LSA-R.S. 6:121B(2), 6:242A(6), and 6:513(3), relative to insurance activities by banks, bank holding companies, or subsidiaries thereof to limit such activity in the event a bank, bank holding company, or subsidiary thereof acquired another bank, bank holding company, or subsidiary thereof, which is authorized to engage in insurance activities. LSA-R.S. 6:121B(2) was amended to provide as follows:

Notwithstanding any other provision of this Title, the commissioner shall not authorize any bank, bank holding company, or subsidiary thereof to engage in any insurance activity except an insurance activity in which a bank may engage pursuant to the provisions of R.S. 6:242(A)(6). However, any bank which was engaged as a general insurance agent or broker on January 1, 1984, may continue to be so engaged. If such bank is acquired after January 1, 1984, by another bank, bank holding company, or subsidiary thereof, the insurance agency activities of the surviving bank, bank holding company, or subsidiary thereof shall be limited to insurance activities for persons who are domiciled in or who own property in the parish where the acquired bank maintained its principal office. However, the surviving bank, bank holding company, or subsidiary thereof may continue to engage in insurance activities for any person who was insured by such bank on July 19, 1990.
[6] Acts 1990, No. 611, § 1, effective July 19, 1990, amended and reenacted LSA-R.S. 6:121B(2), 6:242A(6), and 6:513(3), relative to insurance activities by banks, bank holding companies, or subsidiaries thereof to limit such activity in the event a bank, bank holding company, or subsidiary thereof acquired another bank, bank holding company, or subsidiary thereof, which is authorized to engage in insurance activities. LSA-R.S. 6:242A(6) was amended to provide as follows:

(6)(a) To act as the agent for any insurance company authorized to do insurance business in this state by soliciting and selling insurance, but only with respect to credit insurance which, within the terms and conditions authorized by law, is limited to assuring repayment or partial repayment of the outstanding balance due on a specific extension of credit by a bank in the event of the death, disability, or involuntary unemployment of the debtor and collecting premiums on those policies issued through the bank by such insurance company: and to receive for services so rendered such commissions or fees as may be agreed upon between the bank and the insurance company for which it is acting as agent. Notwithstanding any other provisions of this Title, no bank shall engage or be authorized to engage in any insurance activity that is not expressly permitted by this Paragraph.
(b) Nothing contained in this Title shall prohibit any bank which was engaged as a general insurance agent or broker on January 1, 1984, from continuing to be so engaged. If such bank is acquired after January 1, 1984, by another bank, bank holding company, or subsidiary thereof, the insurance agency activities of the surviving bank, bank holding company, or subsidiary thereof shall be limited to insurance activities for persons who are domiciled in or who own property in the parish where the acquired bank maintained its principal office. However, the surviving bank, bank holding company, or subsidiary thereof may continue to engage in insurance activities for any person who was insured by such bank on July 19, 1990.
[7] Acts 1990, No. 611, § 1, effective July 19, 1990, amended and reenacted LSA-R.S. 6:121B(2), 6:242A(6), and 6:513(3), relative to insurance activities by banks, bank holding companies, or subsidiaries thereof to limit such activity in the event a bank, bank holding company, or subsidiary thereof acquired another bank, bank holding company, or subsidiary thereof, which is authorized to engage in insurance activities. LSA-R.S. 6:513 was amended to provide as follows:

It shall be unlawful:
(1) Until July 1, 1989, for any bank holding company or subsidiary thereof to open for business any bank not now opened for business whether or not a charter, permit, license, or certificate to open for business has already been issued.
(2) For any company to become a bank holding company unless the primary purpose of the corporation is the ownership or control of one or more banks.
(3) For any bank holding company or subsidiary thereof to engage in any insurance activity except an insurance activity in which a bank may engage, provided that if a bank holding company or subsidiary thereof acquires a bank that was engaged as a general insurance agent or broker on January 1, 1984, the insurance activities of the surviving bank, bank holding company, or subsidiary thereof shall be limited to insurance activities for persons who are domiciled in or who own property in the parish where the acquired bank maintained its principal office. However, the surviving bank, bank holding company, or subsidiary thereof may continue to engage in insurance activities for any person who was insured by such bank on July 19, 1990.
[8] As noted in the Historical and Statutory Notes to 12 U.S.C. § 92, this section is based on the ninth paragraph of section 13 of Act December 23, 1913, as amended in 1916. The remaining paragraphs of section 13 are classified to sections 342 to 347, 347c, 347d, 361, 372, and 373 of this title. The notes further provide:

Faulty placement of quotation marks in the provisions of Act Sept. 7, 1916, c. 461, 39 Stat. 753, which enacted this section, erroneously indicated that this section was enacted as an addition to R.S. § 5202 and not as an addition to section 13 of the Federal Reserve Act (Act Dec. 23, 1913, c. 6, § 13, 38 Stat. 263). Thus, when Congress amended R.S. § 5202 in 1918 (Act Apr. 5, 1918, c. 45, § 20, 40 Stat. 512) and omitted any mention of the provisions of this section, it appeared that the Congressional intent was to omit this section. However, see United States National Bank of Oregon v. Independent Insurance Agents of America, June 7, 1993, U.S. Supreme Court, No. 92-484 [___ U.S. ___, 113 S.Ct. 2173, 124 L.Ed.2d 402], holding that the faulty placement of quotation marks was a simple scrivener's error and that this section had not been repealed by the 1918 enactment.
[9] The applicable state laws in this case are LSA-R.S. 6:121B(2), 6:242A(6), and 6:513.
[10] In this case, the federal law which seeks to preempt the Louisiana state law in this case is 12 U.S.C. § 92.
[11] The Kentucky state statute provided as follows:

No person who after July 13, 1984, owns or acquires more than one-half (½) of the capital stock of a bank shall act as insurance agent or broker with respect to any insurance except credit life insurance, credit health insurance, insurance of the interest of a real property mortgagee in mortgage property, other than title insurance.
[12] Since the court in Owensboro concluded that the Kentucky state statute was enacted for the purpose of regulating certain conduct by bank holding companies, not the business of insurance, the court did not determine whether Section 92 specifically related to the business of insurance because, without regard to whether Section 92 relates to the business of insurance, McCarran-Ferguson could not save the Kentucky state statute from preemption.
[13] In support of this position, Judge Batchelder cited Colonial Life and Accident Insurance Company v. American Family Life Assurance Company, 846 F.Supp. 454, 459 (D.S.C.1994).