499 S.E.2d 232

**GREENVILLE HOSPITAL SYSTEM, Respondent,**

v.

**PROVIDENT LIFE & ACCIDENT INSURANCE COMPANY, Trustmark Insurance Company (Mutual), Foothills Staffing & Development, Inc., Health Care Savings, Inc., and Cooper Machinery, Incorporated, Defendants,**

**of whom Trustmark Insurance Company (Mutual), is Appellant,**

and

**of whom Cooper Machinery Incorporated is Respondent.**

**No. 2820.**

Court of Appeals of South Carolina.

Heard Feb. 4, 1998.

Decided March 30, 1998.

Rehearing Denied May 21, 1998.

---

438

Timothy W. Bouch, Stephen P. Groves, and Stephen L. Brown, of Young, Clement, Rivers & Tisdale, Charleston, for appellant.

Annette Roney, of The Laddaga Law Firm, Charleston, and H. Michael Spivey, of Spivey & Ingles, Mauldin, for respondent.

HOWELL, Chief Judge:

Greenville Hospital Systems (GHS) brought this action to recover the hospital bills incurred by Roger Dale Morgan. The trial court granted GHS partial summary judgment against Trustmark Insurance Company. Trustmark appeals, and we affirm.

## I.

Morgan was hired by Cooper Machinery in fall of 1991. On April 1, 1992, Cooper Machinery entered into an agreement with Foothills Staffing and Development Incorporated, whereby Cooper Machinery would lease its employees from Foothills. Pursuant to this agreement, Foothills was primarily responsible for procuring and providing employee benefits. On or about June 1, 1993, Foothill merged with Hazar, Incorporated.

Hazar had a policy of insurance through Provident Life and Accident Insurance Company, which covered Morgan. Provident's group insurance policy became effective July 1, 1992, and was amended several times. On October 31, 1993, Provident terminated its policy with Hazar because Hazar failed to pay the delinquent balance on premiums owed under the contract.[1] According to the policy, Morgan's coverage ceased on the same day Provident terminated the policy.

By letter dated November 29, 1993, Julie Ranks, a benefits administrator with Foothills, informed Foothills' clients that starting on December 1, 1993 all of the accounts currently under Provident would be transferred to a new carrier, Trustmark. As stated in Ranks's letter, the group insurance contract between Hazar and Trustmark became effective on December 1, 1993, at 12:01 a.m. standard time.

Prior to the activation of the Hazar and Trustmark policy, on November 30, 1993, Morgan was admitted to GHS. GHS treated Morgan until February 4, 1994, with the cost totaling

---

1. Although Trustmark contended at oral argument that a genuine issue of material fact existed about when Provident's policy ended, this issue was not raised in its final briefs and therefore is not preserved for appeal. *In Interest of Bruce O.*, 311 S.C. 514, 515, 429 S.E.2d 858, 859 (Ct.App.1993) (An appellant may not use oral argument as a vehicle to argue issues not argued in the appellant's brief.).

$263,033.08.  During his admission to GHS, Morgan signed an assignment of benefits to GHS.

On February 25, 1994, Cooper Machinery sent a letter to Foothills complaining about problems employees were having with their health insurance coverage.  By letter dated February 14, 1994, Brian Main of Hazar wrote a letter detailing the history of Hazar's insurance coverage.  Main explained that Provident offered to provide coverage through November 30, 1993, if Hazar paid the November premium plus terminal funding.  On the other hand, Hazar could simply cancel the policy on October 31, 1993.  Hazar chose the October 31, 1993 cancellation date.  According to Main, Hazar was self-insured from November 1, 1993 through November 30, 1993.

In an effort to sort out the confusion about which insurance coverage was in effect, counsel for GHS sent letters to Trustmark, Provident, and Hazar seeking information about insurance coverage and requesting copies of their plans.  Provident responded that its contract with Hazar terminated on October 31, 1993.  In a letter to GHS's attorney, Karen Kalcic, a Trustmark representative, claimed Trustmark was not responsible for Morgan's medical bills until after Morgan was discharged from the hospital.  Kalcic stated, "It was my understanding that these charges were to be the responsibility of his employer, Hazar, as there was a lapse of coverage between the termination with the prior carrier and the beginning of their coverage with Trustmark."

GHS filed suit against Provident, Trustmark, Health Care Savings,[2] Foothills, Cooper Machinery, and Morgan to collect Morgan's hospital bill.  After the trial court removed Morgan as a defendant, all of the parties moved for summary judgment.  The trial court granted Health Care Savings summary judgment on all claims.  It also granted Provident summary judgment, finding the effective termination date of Provident's policy was October 31, 1993.  Next, the trial court denied GHS's motion against Cooper Machinery and Cooper Machinery's motion against GHS.  Finally, the trial court held Trustmark liable to GHS as a succeeding carrier under S.C.Code

---

**2.** Health Care Savings is a third party administrator who administers claims on behalf of Trustmark.

Ann. § 38–71–760(m) (1989 & Supp.1997) [3] for 85% of Morgan's hospital bills from December 1, 1993 to February 4, 1994. Trustmark appeals.

## II.

■ Trustmark argues that the trial court erred in granting summary judgment without deciding whether S.C.Code Ann. § 38–71–760(i) (1989 & Supp.1997) forced Provident to extend benefits to Morgan. In addition, Trustmark complains that the trial court incorrectly granted summary judgment without first determining whether Hazar had a policy of self insurance effective when Morgan checked into GHS. We find the trial court properly granted summary judgment.

### A.

■ Trustmark contends that the trial court should not have determined that it was responsible without first finding whether Provident was liable under section 38–71–760(i). Section 38–71–760(i) states:

In the case of hospital or medical expense coverages other than dental expense, a reasonable extension of benefits or accrued liability provision is required. The provision is considered reasonable if it provides an extension of at least twelve months under major medical and comprehensive medical type coverages and under other types of hospital or medical expense coverages provides either an extension of at least ninety days or an accrued liability for expenses incurred during a period of disability or during a period of at least ninety days starting with a specific event which occurred while coverage was in force such as an accident.

---

3. S.C.Code Ann. § 38–71–760(m) (1989 & Supp.1997) states in part:

(2) Each person not covered under the succeeding carrier's plan of benefits in accordance with item (1) of this subsection (m) nevertheless must be covered by the succeeding carrier in accordance with the following rules if the individual was validly covered, including benefit extension, under the prior plan on the date of discontinuance and if the individual is a member of the class of individuals eligible for coverage under the succeeding carrier's plan. . . .

(A) The minimum level of benefits to be provided by the succeeding carrier must be the applicable level of benefits of the succeeding carrier's plan reduced by any benefits payable by the prior plan.

*Id.* Trustmark reasons that if Provident was legally obligated to provide extended benefits, then Provident should be solely liable for Morgan's bill.

For section 38–71–760(i) to apply, however, the claimant must be injured or disabled at the time the prior plan terminates. *Id.* The trial court ruled that Provident's plan terminated on October 31, 1993, several weeks before Morgan checked into GHS. Because Provident's October 31, 1993 termination date is the unappealed law of the case, Provident could not be liable under section 38–71–760(i).

## *B.*

■ Before applying section 38–71–760(m) to mandate coverage, Trustmark argues that the trial court should have determined whether Hazar had an intervening self-insurance plan. Section 38–71–760(m) creates a duty for "succeeding carriers" to continue coverage, including benefit extensions, for persons validly covered under a prior plan. S.C.Code Ann. § 38–71–760(m) (1989 & Supp.1997). "A replacement carrier is considered to be a succeeding carrier within the meaning of this section if the effective date of the coverage provided by it is sixty-two days or less after the date of termination of coverage of the prior carrier." S.C.Code Ann. § 38–71–760(k) (1989 & Supp.1997). According to Trustmark, it would not have been a succeeding carrier under section 38–71–760(m) if Hazar was self-insured between the termination of Provident's policy and the beginning of Trustmark's policy.

> When construing a statute, a court must seek to ascertain and effectuate legislative intent. The cardinal rule of statutory construction is that words used in a statute must be given their plain and ordinary meaning without resort to subtle or forced construction to limit or expand the operation of the statute. The language must be read in a sense which harmonizes with its subject matter and accords with its general purpose.

*Koenig v. South Carolina Dept. of Public Safety,* 325 S.C. 400, 403–04, 480 S.E.2d 98, 99 (Ct.App.1996) (citations omitted).

To qualify as a succeeding carrier, Trustmark merely had to be a *carrier* that replaces a prior *carrier* within sixty-two days. *See* S.C.Code Ann. § 38–71–760(k) (1989 & Supp.1997).

Regardless of whether Hazar was an intervening self-insured, Hazar could not have been a prior *carrier*. The plain language of S.C.Code Ann. § 38–71–760(*l*) (1989 & Supp.1997) recognizes a difference between carriers and self-insurers.[4] By phrasing the definition of succeeding insurer in terms of a carrier that follows another carrier, Hazar's status as a possible self-insurer has no effect on Trustmark being a succeeding carrier.

Our interpretation is consistent with the legislative intent behind section 38–71–760(m). As Trustmark admitted, "The Legislature clearly intended that when one group policy is passed from carrier to carrier, a certain minimum level of benefits should be maintained." We simply do not think that an intervening self-insurer in any way affects whether a replacement carrier constitutes a "succeeding carrier." Thus, we do not believe that the trial court erred in not deciding whether Hazar was a self-insurer prior to ruling that section 38–71–760(m) rendered Trustmark liable as a succeeding carrier.

### III.

■ Trustmark next argues that section 38–71–760 is preempted by the Employee Retirement Income Security Act of 1974 (ERISA).[5] We disagree.

■ Under ERISA, all state laws that "relate to" an employee benefit plan are preempted. 29 U.S.C. § 1144(a) (1985). The ERISA savings clause, however, prescribes that ERISA shall not "be construed to exempt or relieve any person from any law of any State which regulates insurance." 29 U.S.C. § 1144(b)(2)(A) (1985). To determine if a state law regulates insurance, and is thereby saved from ERISA preemption, a court should examine whether the state law regulates insurance from a common sense perspective, whether the

---

4. "The prior carrier remains liable only to the extent of its accrued liabilities and extensions of benefits. The position of the prior carrier is the same whether the group policyholder or other entity secures replacement coverage from a new carrier, self-insures, or foregoes the provision of coverage." S.C.Code Ann. § 38–71–760(*l*) (1989 & Supp. 1997).

5. 29 U.S.C. §§ 1001–1461 (1985 & Supp.1998).

application of the savings clause to the particular state law comports with the role of the savings clause as a whole, and whether the state law fits within the McCarran–Ferguson Act's [6] definition of "business of insurance." *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 48–51, 107 S.Ct. 1549, 1553–55, 95 L.Ed.2d 39 (1987).

First, we must ascertain whether section 38–71–760(m), the primary portion of the statute relevant to this appeal, regulates insurance from a common sense perspective. "A common-sense view of the word 'regulates' would lead to the conclusion that in order to regulate insurance, a law must not just have an impact on the insurance industry, but must be specifically directed toward that industry." *Id.* at 50, 107 S.Ct. at 1554. As stated earlier, however, the purpose of section 38–71–760(m) is to ensure that when coverage is provided by a succeeding carrier, a certain minimum level of benefits should be maintained. Ensuring a minimum level of benefits not only affects the insurance industry but also is specifically directed at members of the insurance industry. We, therefore, believe that section 38–71–760(m) regulates insurance from a common sense perspective.

Next, we must examine section 38–71–760(m) in light of the policy underpinnings of the savings clause. The ultimate issue here is whether section 38–71–760(m) furthers the objectives of ERISA. *See John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank,* 510 U.S. 86, 99, 114 S.Ct. 517, 525–26, 126 L.Ed.2d 524 (1993) ("State law governing insurance generally is not displaced, but 'where [that] law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress,' federal preemption occurs.") (citation omitted). ERISA was enacted to protect the interests of participants in employee benefit plans by re-establishing standards of conduct for the fiduciaries of the plans and providing for appropriate remedies, sanctions, and obligations. 29 U.S.C. § 1001(b) (1985). Section 38–71–760(m) comports with ERISA because section 38–71–760(m) helps to protect plan beneficiaries by mandating that a succeeding carrier provide coverage for everyone who was covered by a prior carrier. In addition, section 38–71–760(m) accomplishes its goals without infringing

---

**6.** 15 U.S.C. §§ 1011–1015 (1997).

on ERISA's domain. *See Pilot Life,* 481 U.S. at 54, 107 S.Ct. at 1556–57 (holding a state law involving wrongful processing of claims did not further the objectives of ERISA because ERISA had already had exclusive remedies for this type of action). Thus, we are convinced that section 38–71–760(m) is consistent with the purposes of the savings clause and furthers the objectives of ERISA.

Finally, we look to the McCarran–Ferguson Act to see if section 38–71–760(m) fits within its definition of "business of insurance." According to one commentator, the McCarran–Ferguson Act uses the term "business of insurance" in two different contexts. Karen A. Jordan, *ERISA Pre–Emption: Integrating* Fabe *into the Savings Clause Analysis,* 27 Rutgers L.J. 273 (1996). First, the McCarran–Ferguson Act uses a broad definition of "business of insurance" to enforce its default position that all regulation and taxation of the business of insurance is reserved for the states. 15 U.S.C. § 1012(a) (1997); *see United States Department of Treasury v. Fabe,* 508 U.S. 491, 113 S.Ct. 2202, 124 L.Ed.2d 449 (1993). Second, a narrower definition of "business of insurance" applies to the McCarran–Ferguson anti-trust clause, which states that federal anti-trust statutes are applicable to the business of insurance to the extent that such business is not regulated by state law. 15 U.S.C. § 1012(b); *see Union Labor Life Ins. Co. v. Pireno,* 458 U.S. 119, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982); *Group Life & Health Ins. Co. v. Royal Drug Co.,* 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979). Because there is some debate about whether to apply the broad or narrow definition, we will proceed under the most conservative approach, the narrow definition.

According to the test established in *Pireno,* this court should ask the following: does the law affect the spreading of policyholder's risks; is the law an integral part of the relationship between insurer and insured; and is the law limited to entities within the insurance industry? 458 U.S. at 129, 102 S.Ct. at 3008–3009. In *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985), the Supreme Court applied the *Pireno* test and held that a state law mandating the inclusion of mental health care benefits in general insurance policies met all three factors. Likewise in *Fabe,* an Ohio statute establishing the priority of

creditors' claims in a proceeding to liquidate an insolvent insurance company escaped preemption (at least to the extent that it protected policyholders). 508 U.S. at 508, 113 S.Ct. at 2211–12.

In this case, there is no question that section 38–71–760(m) satisfies all of the *Pireno* tests. Section 38–71–760(m) spreads risk by requiring a succeeding carrier cover everyone who was covered under the prior carrier's policy, regardless of a person's age or health. Next, because of the effect on risk and the minimum level of benefits mandated, section 38–71–760(m) unquestionably is an integral part of the insurer and insured relationship. Lastly, section 38–71–760(m) only applies to those in the insurance industry. Given that section 38–71–760(m) meets all the requirements of the *Pireno* test, section 38–71–760(m) qualifies as falling within the scope of "business of insurance," as defined by the McCarran–Ferguson Act.

We, therefore, rule that section 38–71–760(m) falls within ERISA's savings clause because it passes all of the *Pilot Life* factors. Thus, the trial court correctly held that ERISA did not preempt section 38–71–760(m).

## IV.

Finally, Trustmark argues that the trial court impermissibly rewrote the terms of its policy by making it liable for claims that occurred before the policy became effective. We disagree.

"All statutory provisions relating to insurance contracts become part of the insuring agreement." *Allstate Ins. Co. v. Thatcher*, 283 S.C. 585, 587, 325 S.E.2d 59, 61 (1985). When there is conflict between a statutorily mandated clause and an insurance policy, the statutorily mandated clause is incorporated into the policy. *See Blackwell v. United Ins. Co. of America*, 231 S.C. 535, 99 S.E.2d 414 (1957). Assuming that section 38–71–760(m) conflicts with the terms of Trustmark's policy,[7] then the trial court correctly ruled that section 38–71–760(m) controls.

---

7. It is not certain that the terms of Trustmark's policy conflicted with section 38–71–760(m). On the page entitled "General Provisions," the Trustmark policy states, "CONFORMITY WITH STATE STATUTES—

Accordingly, the decision of the trial court is
**AFFIRMED.**

GOOLSBY and HOWARD, JJ., concur.

Any provision of the Contract which, on its effective date, is in conflict
with the laws of the state in which it was delivered or issued for
delivery is amended to conform to the minimum requirements of such
laws."