[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
November 18, 2004
THOMAS  K. KAHN
CLERK

_____

No. 03-10799

_____

D.C. Docket No. 00-00066-CV-1-MMP

LINDA GILCHRIST, on behalf of themselves
and all others similarly situated,
JOANNE ZIPPERER, JACKIE VALENTINE,

Plaintiffs-Appellees,

versus

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, an Illinois corporation,
ALLSTATE INSURANCE COMPANY, an
Illinois corporation,
NATIONWIDE MUTUAL FIRE INSURANCE
COMPANY, an Ohio corporation,
GOVERNMENT EMPLOYEES INSURANCE
COMPANY, a Maryland corporation,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Florida

_____

**(November 18, 2004)**

Before TJOFLAT and  HILL, Circuit Judges, and MILLS[*], District Judge.

_____

[*] Honorable Richard Mills, United States District Judge for the Central District of
Illinois, sitting by designation.

HILL, Circuit Judge:

This is an appeal under Rule 23(f), Fed. R. Civ. P., from the district court's order certifying a national class of approximately 70 million automobile insurance policyholders. Plaintiffs' complaint seeks treble damages under the federal antitrust laws for alleged premium overcharges. For the following reasons, we have determined that we have no jurisdiction in this matter and shall dismiss the appeal.

I.

Linda Gilchrist, Joanne Zipperer and Jackie Valentine (referred to collectively as "Gilchrist") filed this action seeking to represent a group of individual policy holders who purchased automobile insurance from various insurance companies, including State Farm, Allstate, Nationwide, and GEICO ("Insurers"). Gilchrist alleges that defendants conspired in violation of federal antitrust laws to limit insurance coverage for certain external auto body repairs to the cost of less expensive parts not made by an original equipment manufacturer ("OEM").

Insurers moved to dismiss the complaint on the basis that the McCarran-Ferguson Act, 15 U.S.C. § 1012 (1999), (the "Act") bars plaintiffs' claim because it concerns the "business of insurance," which, under the Act, is not subject to the

2

federal antitrust laws. In November of 2000, the district court denied the motion, holding that the Act does not bar Gilchrist's claim because her claim merely challenges the way in which the Insurers perform their policies, which is not the "business of insurance."

Gilchrist then moved for class certification and the district court held an evidentiary hearing. In November of 2002, the court certified a class consisting of some 70 million of Insurers' policyholders.[1] Pursuant to Rule 23(f), Fed. R. Civ. P., Insurers petitioned for leave to appeal this order, which we granted.

After oral argument of this appeal, we became concerned that McCarran-Ferguson might indeed exclude Gilchrist's claim from federal antitrust jurisdiction. Since we are powerless to enter a judgment in a matter over which we have no jurisdiction, *University of South Alabama v. American Tobacco Co.*, 168 F.3d 405, 409-10 (11th Cir. 1999), we are required, even *sua sponte,* to initiate an inquiry into our subject-matter jurisdiction whenever we become concerned that it may not exist. *Arthur v. Haley*, 248 F.3d 1302, 1303 n.1 (11th Cir. 2001); *Rembert v. Apfel*, 213 F.3d 1331, 1333-34 (11th Cir. 2000). Accordingly, we

_____

[1] The district court certified the following class: "All persons who paid premiums directly to State Farm Mutual Automobile Insurance Co. and affiliates ("State Farm"), Allstate Insurance Co. and affiliates ("Allstate"), Nationwide Mutual Fire Insurance Co. and affiliates ("Nationwide") and Government Employees Insurance Corp. and affiliates ("GEICO), for automobile collision, comprehensive, or property damage insurance at any time between April 18, 1996 and the present."

notified the parties that they could file additional authority on this issue and that we would resolve it prior to any decision on the merits of the appeal. It is to this issue we now turn.

## II.

In 1945, Congress passed the McCarran-Ferguson Act to allow insurers to share information relating to risk underwriting and loss experience without exposure to federal antitrust liability and to preserve for the states the power to regulate the insurance industry. 15 U.S.C. §§ 1012-1013(1999); *Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119, 133 (1982). The Act expressly exempts insurer activities from the reach of the Sherman Act when three elements are met: (1) the challenged activity is part of the "business of insurance"; (2) the challenged activity is regulated by state law; and (3) the challenged activity does not constitute a boycott of unrelated transactions. *Uniforce Temporary Personnel, Inc. v. National Council on Compensation Ins., Inc.*, 87 F.3d 1296, 1299 (11th Cir. 1996).[2] If the Act applies to Gilchrist's claim, we have no jurisdiction over it.

---

[2] The Act provides:

> The *business of insurance*, and every person engaged therein, shall be *subject to the laws of the several States* which relate to the regulation or taxation of such business.

> [T]he Sherman Act . . . shall be applicable to the business of insurance to the extent that such business is *not* regulated by State law.

4

A.  *The Business of Insurance*

Gilchrist argues that the Act does not apply to her claim, relying on two Supreme Court cases holding that, while the Act exempts the business of *insurance*, it does not exempt the business of *insurers*.  *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205 (1979)*;  Pireno*, 458 U.S. at 129.  She contends that her claim implicates the latter, rather than the former.  She characterizes her claim as an attack on Insurers' cost-cutting arrangements with third parties, which, she alleges, require the use of non-OEM parts in the repair of its policyholders' vehicles.  This practice, she argues, is "a means of using cheaper repair parts to satisfy the insurer's *existing* policy obligations."  (Response to Motion to Dismiss, p. 20).  Furthermore, Gilchrist claims that Insurers created and financed the Certified Auto Parts Association ("CAPA") to promote inferior crash parts as acceptable substitutes for OEM parts, thereby advancing the anticompetitive conspiracy.  Finally, she contends that Insurers have benefitted from the conspiracy by reducing their repair costs and raising their profits above what they would experience in a competitive market.  In sum, Gilchrist contends that she is attacking the way in which Insurers conduct their *business*.

15 U.S.C. § 1012 (emphases added).

Insurers, on the other hand, characterize Gilchrist's claim as an attack on both their rate-making and the performance of their insurance contracts – activities at the heart of the business of *insurance*.

### III.

An activity is part of the business of insurance if it has "the effect of transferring or spreading a policyholder's risk," is "an integral part of the policy relationship between the insurer and the insured," and is limited to entities within the insurance industry. *Pireno*, 458 U.S. at 129. Under this test, the Supreme Court has held conclusively that both rate-making and the performance of an insurance contract – including the adjustment of claims – constitute the business of insurance. *Royal Drug*, 440 U.S. at 224 ("the fixing of insurance rates is the 'business of insurance'"); *United States Dept. of Treasury v. Fabe*, 508 U.S. 491, 503 (1993) ("There can be no doubt that the actual performance of an insurance contract falls within the "business of insurance" as we understood that phrase in *Pireno* and *Royal Drug*") (citing *Pireno*, 458 U.S. at 134 n.8) .

Rate-making, of course, is the paradigmatic example of the conduct that Congress intended to protect by the McCarran-Ferguson Act. *Royal Drug*, 440 U.S. at 221 ("Because of the widespread view that it is very difficult to underwrite risks in an informed and responsible way without intra-industry cooperation, the

6

primary concern of both representatives of the insurance industry and the

Congress was the cooperative ratemaking efforts be exempt from the antitrust

laws"). Similarly, the Court has rejected the argument that performance of

Insurers' contractual duties does not constitute the business of insurance. *Fabe*,

508 U.S. at 503. The Court reasoned:

> Without performance of the terms of the insurance policy, there is no
> risk transfer at all. Moreover, performance of an insurance contract
> also satisfies the remaining prongs of the *Pireno* test: It is central to
> the policy relationship between insurer and insured and is confined
> entirely to entities within the insurance industry.

*Id.* at 504.[3]

Rate-making and the performance of contractual obligations are

fundamental to the business of insurance because they focus on the relationship

between the insurance company and its policyholders. The Supreme Court has

made clear that:

> [t]he relationship between insurer and insured, the type of policy
> which could be issued, its reliability, interpretation, and enforcement
> – these were the core of the "business of insurance."

---

[3] The district court appears to have concluded that Insurers' actions regarding OEM parts was not part of the business of insurance because these actions were not part of the decision "whether or not to enter into contracts with the potential insured," but rather involved "the fulfillment of that contract once it was entered into . . . ." *Fabe* makes clear that this was error. 508 U.S. at 503-04. *See also Blackfeet Nat'l Bank v. Nelson*, 171 F.3d 1237, 1246 n.13 (11th Cir. 1999) (Congress did not intend meaning of "business of insurance" to vary within the statutory sections).

7

*SEC v. National Securities, Inc.*, 393 U.S. 453, 460 (1969).

Thus the real question in this case is which party has more accurately characterized Gilchrist's claim. Are Insurers correct that the claim is clearly about rate-making and performance of the insurance contract? Or does Gilchrist correctly describe her claim as attacking a conspiracy, entirely outside the rate-making process, in which Insurers agreed to avoid OEM parts and worked with third parties to disseminate false information about such parts in order to exclude competition from other insurers who would have provided OEM-quality repair policies?

In order to answer this question, we must eschew the parties' characterizations of the claim and examine the allegations of the complaint.

The Complaint makes the following allegations:

¶ 4.   Defendants have conspired among themselves, and with unnamed co-conspirators, to agree to provide their policyholders wherever possible inferior, imitation crash parts (which do not restore their damaged vehicles to their original, pre-loss condition, and are not of like kind and quality as parts originally provided by automobile manufacturers).

¶ 5.   The effect of the conspiracy has been to raise and maintain insurance prices or premiums paid by policy holders above competitive levels for the actual repairs provided using inferior or imitation crash parts, and to

reduce the quality of repair service to the Class herein alleged.

¶ 32. [Insurers] have agreed to provide and promote inferior, imitation crash parts for the restoration of the automobiles of the Plaintiffs and other member of the Class.

¶ 33. Defendants have pursued this course of conduct despite their contractual obligation to restore insured vehicles to their pre-loss condition and to use parts of like kind and quality as those originally employed by automobile manufacturers.

¶ 43. Defendants' conspiracy to reduce their repair costs and increase their profits by agreeing to provide inferior, imitation crash parts to class members, and to misrepresent the quality of their crash parts, have (sic) caused class members to pay insurance prices or premiums above competitive levels for the actual quality of repair provided by the Defendants using inferior crash parts.

¶ 46. Defendants and unnamed co-conspirators have conspired and combined with the effect of raising and maintaining prices, that is, premiums, for automobile insurance paid by Plaintiffs and other Class members above the competitive levels that would have prevailed for the actual vehicle repair provided using inferior, imitation parts.

These allegations clearly attack both Insurers' premium-setting and the performance of their contractual obligations to their policyholders. Gilchrist's claim that Insurers used "inferior, imitation crash parts" in the repair of their policyholders' vehicles "despite their contractual obligation to restore insured vehicles to their pre-loss condition and to use parts of like kind and quality" is an

9

attack on how Insurers perform their contractual obligations to their policyholders. Her claim that "[t]he effect of the conspiracy has been to raise and maintain insurance prices or premiums paid by policy holders above competitive levels for the actual repairs provided" is an indirect allegation of price-fixing and, therefore, a direct attack on the integrity of Insurers' rate-making.[4]

We have previously rejected attempts to avoid McCarran-Ferguson by plaintiffs who creatively disguised what was fundamentally an attack on insurance premiums by masking it with a barrage of antitrust verbiage. *Uniforce*, 87 F.3d at 1300. In *Uniforce,* just as here, the plaintiff characterized its claim as attacking "the manipulation of the cost of workers compensation insurance" resulting in the imposition of unreasonable premiums. *Id.*[5] We said there, "[s]imply put, Uniforce's antitrust claims center on the appellees' rate-making activity." *Id.* at 1299. Similarly, in *Slagle v. ITT Hartford*, 102 F.3d 494, 498 (11th Cir. 1996), we held that allegations of premium stabilization through horizontal market allocation of the windstorm insurance market was, in reality, an attack on insurance rate-making. *Id.* In both these cases, we rejected plaintiffs' attempts to disguise what

---

[4] It is an attack, as well, on the state regulatory process that supervises the rate-making process.

[5] Gilchrist challenges the manipulation of the cost of automobile insurance by the use of non-OEM parts resulting in the imposition of unreasonable premiums.

were basically attacks on premiums and rate-making by alleging conspiracies to stabilize or inflate profits. We do so again here.[6]

The heart of Gilchrist's complaint is that Insurers have lowered the quality and cost of repairs by specifying the use of non-OEM parts and not passing along the savings to their policyholders through reduced premiums. Despite Gilchrist's protestation that this claim "does not involve the contract with the insured," it is precisely that contract that is at issue. Her claim goes to the heart of "the relationship between insurer and insured" and attacks the "reliability, interpretation, and enforcement" of the insurance policy itself. *National Securities*, 393 U.S. at 460.

This focus can be illustrated by comparison to the claims in *Royal Drug* and *Pireno*. The plaintiff in *Royal Drug* was not a policyholder, but a pharmacy that challenged the cost-cutting agreements insurers had made with other pharmacists about reimbursement for prescription drug coverage. The Supreme Court reasoned that such side agreements with *third* parties are ancillary to the insurance

---

[6] The district court distinguished both *Slagle* and *Uniforce* as cases involving the *formation* of an insurance contract – the business of insurance – as opposed to the *performance* of the contract – the business of insurers – as in *Royal Drug* and *Pireno*. The court concluded that *Royal Drug* and *Pireno* stand for the proposition that the requisite transference of the risk aspect of the contract is only present in its formation, not its performance. As we have seen above, the Supreme Court has rejected this interpretation of *Royal Drug* and *Pireno*. *Fabe*, 508 U.S. at 503 ("[W]e do not read *Pireno* to suggest that the business of insurance is confined entirely to the writing of insurance contracts, as opposed to their performance").

11

contract because "'Blue Shield's policyholders are basically unconcerned with the contract between the insurer and the Participating Pharmacy.'" 440 U.S. at 214 n. 11 (quoting *Royal Drug Co., Inc. v. Group Life & Health Ins. Co.*, 556 F.2d 1375, 1381 (5th Cir. 1977)). Cost-cutting side agreements do not affect the "relationship between insurer and insured," and, thus, are not the business of insurance.

In *Pireno*, plaintiffs were chiropractors who challenged a peer review process used to decide whether chiropractic charges were necessary and reasonable. The plaintiffs sought damages for amounts paid for chiropractic services, not premiums charged to policy holders. As in *Royal Drug*, the challenged practice was a "matter of indifference" to the policyholders. 458 U.S. at 132.

Gilchrist attempts to bring her claim within the rule of *Royal Drug* and *Pireno* by casting it as an attack on the cost-cutting arrangements of Insurers regarding OEM parts. The problem with this interpretation, however, is that Gilchrist does not specify any third party agreements, or even third parties.[7] Nor is

---

[7] Gilchrist's allegations regarding CAPA's activities do not assert that Insurers have entered into ancillary cost-cutting side agreements with it that are not the business of insurance. Rather, she alleges that Insurers and CAPA have conspired to misrepresent the quality of non-OEM parts in order to sell policies permitting the specification of non-OEM parts. "An insurance company's methods of inducing people to become policyholders pertain to the company-policyholder relationship and thus constitute an integral part of 'the business of insurance.'" *Dexter v. Equitable Life Assur. Soc. of United States*, 527 F.2d 233, 235 (2d Cir. 1975). *See also Ocean State Physicians Health Plan, Inc. v. Blue Cross & Shield*, 883 F.2d

12

Gilchrist, herself, a third party (as were the plaintiffs in *Royal Drug* and *Pireno*) challenging ancillary reimbursement arrangements with other third parties.

On the contrary, Gilchrist is a policyholder whose claim is that Insurers have charged excessive premiums for inferior repair work on her automobile. She alleges that Insurers have failed to perform their *obligation* under the insurance policies to provide repair parts of a "like kind and quality." Unlike an ancillary cost-cutting agreement, a claim that an insurer has not performed its obligations under its contract with an insured goes to the heart of their relationship. As the Court observed in *Royal Drug*:

> The fallacy of the petitioners' position is that they confuse the *obligations* of Blue Shield under its insurance policies . . . and the *agreements* between Blue Shield and the participating pharmacies, which serve only to minimize the costs Blue Shield incurs in fulfilling its underwriting obligations. The benefit promised to Blue Shield policyholders is that their premiums will cover the cost of prescription drugs except for a $2 charge for each prescription. So long as that promise is kept, policyholders are basically unconcerned with arrangements made between Blue Shield and participating pharmacies.

*Id.* at 213-14 (emphasis added).

---

1101, 1108 n.7 (1st Cir. 1989) (McCarran-Ferguson immunity "would be thin indeed if it were deemed to cover the content of policies, but not the marketing . . . activities which necessarily accompany [them]").

13

Just as was the *filling* of prescriptions in *Royal Drug*, the *repair* of the

insured's automobile, and the way in which it is repaired, are the obligation of

Insurers under their policies of insurance.  Both are the business of insurance.  The

benefit promised to Insurers' policyholders is that their automobiles will be

repaired with parts of like kind and quality.  So long as that *insurance* promise is

kept, policyholders are basically unconcerned with any business arrangements

Insurers make with third parties.  Gilchrist's complaint is that this promise has not

been kept, and this is an attack on the business of insurance.

B.    ***Regulated by  State Law***

The State of Florida[8] heavily regulates the insurance industry.  *Slagle*, 102

F.3d at 497-98 ("[T]he conduct is also regulated by the State of Florida."  Fla. Stat.

§ 627.062 (1993)); *Uniforce,* 87 F.3d at 1299 n. 3.

Furthermore, the use of OEM parts is also regulated by the various states.[9]

State regulators have recognized the issues surrounding the use of non-OEM parts

and have enacted rules designed to regulate their use.  Some states approve

specification of non-OEM parts with vehicle-owner consent or appropriate

---

[8] The named plaintiffs purchased their automobile insurance policies in the State of Florida.

[9] The complaint alleges that Insurers require non-OEM parts "when possible."  This very qualification indicates the problem with Gilchrist's claim, because it is state regulation of the use of these parts that requires this qualification.

disclosure on the repair estimate. At least one jurisdiction requires insurers to consider using non-OEM parts in specified situations. Mass Regs. Code tit. 211, § 133.04 (2003). We conclude that both the insurance industry in general and the use of non-OEM parts in particular are regulated by the states.

Since Gilchrist's claim is aimed at the business of insurance, and the challenged activity is regulated by the state, it is barred by McCarran-Ferguson unless it also constitutes an illegal boycott under the Sherman Act.

### C.    *The Boycott Exception*

The McCarran-Ferguson Act provides in pertinent part:

> Nothing contained in this chapter shall render the said Sherman Act inapplicable to any agreement to  boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation.

15 U.S.C. § 1013(b). Even though Gilchrist's claim attacks practices that are the business of insurance and regulated by state law, if these practices constitute a prohibited boycott, then they are not exempted from our jurisdiction. *Uniforce*, 87 F.3d at 1300.

For purposes of the McCarran-Ferguson Act, the Supreme Court defines a "boycott" as the refusal to deal in a collateral transaction as a means to coerce terms respecting a primary transaction. *Hartford Fire Ins. v. California*, 509 U.S.

15

764, 801-05 (1993). "It is the refusal to deal beyond the targeted transaction that gives the great coercive force to a commercial boycott." *Id.*

Gilchrist does not allege that Insurers refused to deal with her in a collateral transaction in order to coerce the terms of her insurance contract. On the contrary, her complaint alleges the following boycott:

> ¶ 53. Defendants and unnamed co-conspirators have conspired and combined to refuse to deal with parts manufacturers selling crash parts of like kind and quality as those originally provided by automobile manufacturers, and capable of restoring class members' vehicles to pre-loss condition. . . . Defendants have also conspired and combined to boycott Plaintiffs and Class members by agreeing to withhold from them crash parts of like kind and quality as originally provided by automobile manufacturers.

The boycott she alleges concerns the primary transaction itself – the refusal to provide OEM parts in the repair of policyholders' vehicles. The alleged boycott involves the very same refusal to deal – with OEM parts, either by buying them from their manufacturers or by providing them to plaintiffs in the repair of their vehicles. Consequently, we conclude that the allegations of the complaint are insufficient to state a cognizable antitrust boycott claim as they do not allege a "refusal to deal in a collateral transaction as a means to coerce terms respecting a primary transaction. *Id.*

IV.

16

As Gilchrist's claim attacks rate-making and the performance of the insurance contract, both the business of insurance, and does not allege a cognizable antitrust boycott, the McCarran-Ferguson Act removes her claim from our jurisdiction. Accordingly, we shall dismiss this appeal and remand this case to the district court with instructions to dismiss the action.

APPEAL DISMISSED, and case REMANDED to the district court with instructions to dismiss.